# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

MUSE v. STERN.

JANUARY 21st, 1886.

1. APPELLATE COURT—*Two trials—Case at bar.*—At first trial verdict was for plaintiff and set aside ; and he excepted ; at second, verdict was for defendant—

HELD :

    If first verdict was erroneously set aside this court will enter judgment on that verdict and set aside all subsequent proceedings.

2. IDEM— *Verdict set aside—Evidence certified.*—Where evidence is conflicting and involves credibility, and the verdict is set aside and the *evidence* is certified, this court will look at the *whole evidence*, and sustain the verdict, unless it be against the law or the evidence, or without evidence.

3. MASTER AND SERVANT—*Negligence—Case at bar.*—Straus & Stern were partners in trade. Straus, individually, owned a horse and phaeton. He sent *his* servant with horse and phaeton to meet and convey Stern to their store. Whilst returning, driver recklessly drove against Muse, knocking him down and injuring him. In action by *Muse* v. *Stern*—

HELD :

    1. Relation of master and servant did not exist between defendant and driver, and plaintiff cannot recover.

    2. Defendant's mere presence at the injury does not render him liable for the driver's negligence.

Error to judgment of circuit court of city of Richmond, in an action of trespass on case by Muse, plaintiff, against Stern, defendant. The judgment being against Muse, he obtained a writ of error.

Opinion states the case.

*Robert Stiles,* for the plaintiff in error.

*John Lyon* and *A. M. Keiley,* for the defendant in error.

HINTON, J., delivered the opinion of the court.

The action was trespass on the case, to recover damages for the negligent management and direction of a horse and phaeton, whereby the plaintiff was injured. At the time of the accident the defendant was being driven by the coachman, pursuant to an order from his employer, who was a partner of the defendant, to the firm's place of business, on Main street, in the city of Richmond.

There were two trials of the case in the court below. On the first trial the jury found a verdict for the plaintiff, which was set aside by the court; whereupon the plaintiff excepted. Upon the second trial the verdict was for the defendant; and the court refusing to set it aside, the plaintiff again excepted. With this last bill of exceptions the facts proved are certified.

In the progress of these trials exceptions were taken to other rulings of the court, but, as in the view I take of the case, it must be decided on grounds wholly distinct from those contained in those exceptions, it will not be necessary for me to advert to them in this opinion.

The rule of the appellate court, where there have been two trials of a case in the lower court, is to look only to the proceedings on the first trial, and if it discovers that the trial court erred in setting aside the verdict on that trial, to set aside and annul all the proceedings subsequent to said verdict, and enter judgment thereon. *Pleasants* v. *Clements,* 2 Leigh, 474; *Terry* v. *Ragsdale,* 33 Gratt. 344; *Brown* v. *Rice's Adm'r,* 76 Va. 665.

Looking, then, to the proceedings on the first trial, a preliminary inquiry arises as to the attitude in which the plaintiff in error should stand in this court. In this case, unlike most cases in which the complaint is of a judgment refusing or granting a new trial, the court has "declined to certify the facts because the evidence is conflicting and contradictory, and involved questions of the credibility of the witnesses," and has certified the evidence. The question, therefore, is whether the appellate court will look to the whole evidence in determining whether the circuit court erred in its action in setting aside the verdict, or will only entertain the plaintiff upon condition that he shall surrender all of his oral evidence and rest his case upon the evidence of the defendant.

For the plaintiff in error it is strenuously insisted that where the plaintiff comes to this court with the verdict of the jury, who are the proper triers of the facts, and whose judgment is entitled to especial weight in all cases where there is a conflict of evidence and questions as to the credibility of witnesses, in his favor, the court should look to the whole evidence upon the first trial and sustain the verdict rendered upon that trial, unless it can perceive that there has been a plain deviation from right and justice, and that the jury have found a verdict against the law or against the evidence or without evidence. And upon a careful consideration of the subject we have arrived at the same conclusion.

From a brief review of the leading cases in regard to new trials in this State, it will be readily seen that there is nothing in the reasons upon which they are rested which militates in the slightest degree against the adoption of such a rule.

In *Bennett* v. *Hardaway*, 6 Munf. 125, it was held that in cases depending upon the oral testimony of witnesses the bill of exceptions must contain the facts which the court consid-

ered established by the testimony, and not the testimony itself. The reason given for this resolution is that it would be unsafe for this court to revise and reverse an opinion of the lower court on a question perhaps touching the weight of evidence and the credit of witnesses without having the same lights and the same data as were possessed by the inferior court. And Judge Roane, who delivered the opinion of the court, as an illustration of one of the evil consequences which might result from the adoption of the opposite rule, said : "It does not follow that the judge believes every witness who gives evidence before him, as he may well hesitate to do from the manner of testifying and other extraneous circumstances ; nor can he do it where they conflict one with another. It is evident, therefore, that in this case the opinion of this court might be founded on the testimony of witnesses who were discredited both by the *jury* and the court below." On the other hand, says he, where the bill contains a certificate of facts, the exception is not liable to the objections which exist when the evidence is certified. For in that case " the appellate court does not   *  * depart from or overrule the decision of the trying court as to the weight of testimony or the credit due to any witness. It only acts upon his own certificate and acknowledgment of his opinion upon the subject. Such a bill of exceptions   *  * only states briefly the facts as they appeared to the judge, and are admitted by him to have been proved, and in consequence of such, his admission, the appellate court founds its decision upon the same facts as governed the court below."

But this case ( *Bennett* v. *Hardaway* ), was soon—to adopt the expressive phrase of Carr, J., in *Ewing* v. *Ewing*, 2 Leigh, 340 —curtailed of its fair proportions. For, by a line of decisions beginning with *Carrington* v. *Bennett*, 1 Leigh, 340, decided as early as 1829, it was quickly established, as a qualification of

the rule, that if the bill of exceptions contains a certificate of the oral testimony given on the trial, the appellate court would review and reverse the judgment, if, after rejecting all the oral testimony of the excepting party, and giving full force and credit to the evidence of the adverse party, the judgment still appears to be wrong. *Rohr* v. *Davis*, 9 Leigh, 30; *Pasley* v. *English*, 5 Gratt., 141; *Carrington* v. *Goddin*, 13 Gratt., 587; *Gimmi* v. *Cullen*, 20 Gratt., 439; *Read's Case*, 22 Gratt., 924; *Danville Bank* v. *Waddill*, 31 Gratt., 469; *Dean's Case*, 32 Gratt., 916; *Creekmur* v. *Creekmur*, 75 Va. 432; *Taylor's Case*, 77 Va., 692. This qualification, while it restricts the operation of the rule laid down in *Bennett* v. *Hardaway*, does not contravene the principle of that case. For, as Cabell, J. acutely observes, in *Ewing* v. *Ewing*, *supra*, the appellate court does not decide on the credit of the witnesses; it proceeds on the admission of their credit; "and surely if," as a former and distinguished judge of this court puts it, in a lucid article touching this subject, "a judgment against a party, after he has been stripped of *all* his own oral evidence, and *all his adversary's evidence has been accorded full force and credit, still* appears to be wrong, that judgment *ought* to be reversed." Va. L. J., 1885, p. 259.

This court having gone thus far in opening the door for the admission of evidence, in *Powell* v. *Tarry*, 77 Va. 263, took another step forward, and in that case held that whenever the inferior court, for any cause, could not or would not certify the facts, that it must, upon the application of the party aggrieved, certify the evidence. Thus expressly overruling *Grayson's Case*, 6 Gratt. 724, upon this particular point, and by necessary implication, overruling *Brooks* v. *Calloway*, 12 Leigh, 466, and *Taliaferro* v. *Franklin*, 1 Gratt. 332, on the same point.

It will be seen from this *résumé* of the cases that there has been a very gradual but growing disposition on the part of the

court to relax the rule established in *Bennett* v. *Hardaway*, prohibiting the court from a judgment granting or refusing a new trial when the certificate contained the evidence instead of the facts, wherever it could be done without invading the province of the jury, and referring questions as to the weight of evidence and credit of witnesses to this court, and revising the judgment of the trying court upon lights and data inferior to those possessed by that court.

The rule contended for will produce neither of these results. It refers no question as to the credit of the witnesses to this court; but assuming that the witnesses who testified for the party prevailing are equally credible with those who testified for the losing side, leaves it to this court upon the evidence as a whole whether there has been a plain deviation from right and justice, and whether the verdict was against law or contrary to the evidence—*i. e.*, without evidence or against evidence. Nor will such a rule be amenable to the objection that it enables the appellate court to revise the judgment of the lower court without having the same lights and data that were possessed by that court. For we must presume, from the failure of the judge to certify otherwise, that he believed all of the witnesses to be credible, and, therefore, that he set aside the verdict on the only grounds upon which he could properly set it aside—that is, because it was without evidence, against the evidence, or against law. Excluding, then, the supposition that he saw something in the manner of testifying of some of the witnesses that impaired their credit, for the reason stated above, that he declined to certify that such was the case, as he clearly might have done, it seems to us to be obvious that the appellate court has all the means necessary to lead them to a correct conclusion that were possessed by the lower court. It is equally clear that cases of the kind with which we are now dealing do not fall within the reason of the rule which requires

the exceptor, where both the jury and the court below are against him, to strip himself of all his oral testimony, and prevail, if prevail he can, upon the evidence of his adversary, and therefore ought not to be bound by that rule. After careful reflection we perceive no valid objection to our looking to the whole evidence in cases like the present one; and as it seems that that was done in *Brown* v. *Rice,* 76 Va. R., 630, it will be done here.

It seems, however, to be assumed that if we look to the evidence in this case we must affirm the verdict. To this we do not assent. For whilst great weight is always—and justly—attributed to the verdict of a jury in a case where the evidence is conflicting and the credibility of witnesses is involved; and whilst the power of the court to grant a new trial, because the verdict is contrary to the evidence, should be very cautiously exercised, and never in a doubtful case merely because the court, if on the jury, would have given a different verdict; yet we believe it cannot be successfully controverted that the power exists. *Ross* v. *Overton,* 3 Call, 319; *Brugh* v. *Shanks,* 5 Leigh, 649; *Green* v. *Ashby,* 6 Leigh, 150; *Patteson* v. *Ford,* 2 Gratt. 23; *Hill's Case,* 2 Gratt. 595; *Downer & Co.* v. *Morrison,* 2 Gratt. 240. And that in a proper case—that is, where the verdict is clearly contrary to the law and evidence—it should be exercised.

In this case we think the verdict was clearly contrary to the law and the evidence. For whatever conflict of testimony there may be about points of evidence not vital to the merits of the case, the evidence incontestibly establishes the following facts: The coachman in charge of the horse and phaeton on the occasion of the accident was a domestic servant, hired and paid by one M. L. Straus, the father-in-law and partner of the defendant Stern. The horse and phaeton were the individual property of Straus, and kept on his premises. The business of the

boy or coachman was to attend to the horse and phaeton, and when not so engaged to attend about the house, and in good weather drive Mr. Straus out. That on the occasion of the accident, the driver had been sent by Straus to meet the defendant and convey him from the depot to the store of the firm. And that as soon as the defendant got into the phaeton the driver drove off rapidly down Byrd street in the direction of the store; and in driving across the railroad track on Eighth street, the plaintiff was struck by one of the wheels of the vehicle, and knocked down and injured.

Now, upon this state of facts, can it be maintained that the driver was the servant of the defendant?

The liability of a third person, to the person injured, for the negligence of another, proceeds upon the maxim *qui facit per alium, facit per se*, and presupposes the existence of the relation of master and servant between such third person and the person actually guilty of the negligent act. It is founded upon the right which the employer has to select his servants and to discharge them if not competent or skillful, and to direct and control them while in his employ. The servant is regarded as an instrument set in motion by the master, and if any injury occurs to another through the negligence or unskillfulness of such servant, while in the course of his employment, it is deemed reasonable that he who has selected the servant should be answerable for such injury. *Turberville* v. *Stampe*, 1 Lord Raymond, 266; *Smith* v. *Lawrence*, 2 Man. & R. 1; *Rapsen* v. *Cubitt*, 9 Mee. & Wels. 710; *Hobbit* v. *London and Northwestern Railway Co.*, 4 Exch. R. 254; *Crockett* v. *Calvert*, 8 Ind. R. 127. Hence, in cases of this character, when it has once been ascertained in whose employ the servant actually is, it is only necessary to ascertain further that the servant was engaged at the time the act of negligence was committed, in the performance of some duty enjoined upon him by his mas-

ter, within the scope of employment, to fasten upon the master a liability for any injury resulting from the negligent act of the servant.

These views have received the approval of the most distinguished judges and text-writers in this country and in England. Story on Agency (9th ed.), sec. 453 *et seq.* Whart. on Negligence (2d ed.), sec. 156 *et seq.* 1 Pars. on Contracts, 105 *et seq.*

In the great case of *Laugher* v. *Pointer*, 5 Barn. & Cress. 547, it was held by Lord Tenterden, C. J., and Littledale, J., Bayley and Holroyd, JJ., dissenting, that the owner of a carriage, who had hired of a stable-keeper a pair of horses to draw the carriage and a driver to drive them, there being no evidence of any adoption on the part of the owner of the carriage of the driver as his servant, was not liable for an injury done to the horse of a third person through the negligent driving of such coachman or driver. In that case Littledale, J., said: "According to the rules of law every man is answerable for injuries occasioned by his own personal negligence; and he is answerable also for acts done by those whom the law denominates his servants; because such servants represent the master himself, and their acts stand upon the same footing as his own. And in the present case the question is, whether the coachman, by whose negligence the injury was received, is to be considered a servant of the defendant. For the acts of a man's own domestic servants there is no doubt the law makes him responsible; and if the accident had been occasioned by a coachman who constituted a part of the defendant's own family, there would be no doubt of the defendant's liability, and the reason is that he is hired by the master either personally or by those who are intrusted by the master with the hiring of servants, and he is therefore selected by the master to do the business required of him."

In *Quarman* v. *Burnett*, 6 Mee. & Wels. 409, the same ques-
tion arose in the court of exchequer, and the opinions of Lord
Tenterden and Littledale, J., were affirmed in a carefully pre-
pared opinion by Baron Parke. In the course of that opinion
he says: "Upon the principle that *qui facit per alium, facit per
se*, the master is responsible for the acts of his servants, and
that person is undoubtedly liable who stood in the relation of
master to the wrong-doer—he who had selected him as his ser-
vant, from the knowledge or belief in his skill and care—and
who could remove him for misconduct, and whose orders he
was bound to receive and obey; and whether such servant has
been appointed by the master directly or intermediately through
the intervention of an agent authorized by him to appoint ser-
vants for him can make no difference."

In view of these well-settled principles we cannot escape the
conclusion that the relation of master and servant did not
exist, either in law or in fact, between the defendant and the
driver at the time the injury was received by the plaintiff.

It may be true, as observed by Baron Parke in *Quarman* v.
*Burnett, supra*, that there may be special circumstances which
may render the hirer of job-horses and servants, and I appre-
hend other bailees as well, responsible for the neglect of a ser-
vant, though not liable by virtue of the general relation of
master and servant. He may become so by his own conduct,
as by taking the actual management of the horses, or order-
ing the servant to drive in a particular manner, which occa-
sions the damage complained of, or to absent himself at one
particular moment, and the like. But as none of these or like
circumstances appear in the evidence in this case, we need give
no opinion as to the legal effect of them.

It is sought, however, to liken this case to the case of
*McLaughlin* v. *Pryor*, 4 Mann. & Granger, 48. That case went
off on the ground that the defendant was a joint trespasser

with the post-boys. But none of the circumstances relied on in that case to render the defendant liable exist in this. There the defendant, who, together with a party of friends, had hired a carriage and four post-horses, driven by two postilions in the service of the owner of the horses, was on his way to Epsom races. The defendant and another person rode on the box of this carriage. The plaintiff was also proceeding to the races in a pony-gig belonging to and driven by one Mason. At the toll-bar at Sutton a line of carriages had formed, and Mason's gig was in that line. The carriage in which the defendant and his friends were driving came up to the toll-bar about the same time with Mason's gig, but the carriage was out of line. Mason's gig was advancing at the time slowly in the line (there being a stoppage for the purpose of taking toll at the gate), when the postilion on the wheel-horse of the carriage in which the defendant was seated called out to the postilion on the leader, " *Go in there!*" The latter immediately turned his horses' heads before Mason's gig. Mason endeavored to keep his pony in the line, when the man on the wheel-horse of the carriage again called out, "Go on, you are all right, there!" The postilion on the leader again pushed his horses forward, and the trace of the wheel-horse caught the wheel of Mason's gig and pulled it over, and both the plaintiff and Mason fell out. Some one in the carriage called out, "Go on, go on!" but Mason got up, and laying hold of the horses' heads, stopped them, telling the party in the carriage that they should not move on, for he was determined to take the horses back to the cock at Sutton until he knew to whom they belonged. After some discussion, the defendant said to Mason, "I will settle it with you here now; I will give you money to any amount; tell me what you want, you shall have it." Mason refused to settle the matter then, but after the defendant had given him his card, saying he would be answerable for all that

had occurred, the carriage was allowed to proceed. The defendant subsequently twice admitted that he was in duty bound to repair the gig, but said he would settle with the plaintiff, McLaughlin, first. But a dispute having arisen between the parties as to the accident, the defendant said: "If you had quietly gone out of the line, it would not have happened. If you had done that, *I* had intended to have pulled up and let you in again, in the front." In that case, Tindal, C. J., after saying that the post-boys were trespassers, said: "Then the question is, whether the defendant was jointly a trespasser with them; whether the part he took in the proceeding was sufficient to make him liable with them; and whether there were circumstances in the case which would justify the jury in coming to that conclusion." Proceeding to argue as to the liability of the defendant, Pryor, the Chief Justice, then says: "It appears that he was riding on the box of the carriage when the accident occurred, and saw what was going on; that *there was a line of carriages into which the post-boys were endeavoring to force themselves;* and he must have known the object of the post-boys in doing what they did." Then, after saying that the fact that he saw what was done was some evidence, "though * * not strong evidence," to go to the jury to show that he assented to the act of the post-boys, the Chief Justice adds: "There is nothing to show that he repudiated the act of the post-boys; on the contrary, *he professed throughout to hold himself responsible;* he told Mason, who was driving the gig in which the plaintiff was seated at the time of the accident, that if *he* had succeeded in getting into the line *he* should have allowed Mason to return to his former position in the line. All this shows that he had a control over the post-boys, and that he assented to their acts." In that case, it was held that the defendant was liable, not as a master for the acts of his servant, but as a joint trespasser, on the ground that it appeared

that he assented to the act from which the injury occurred to the plaintiff.

It can scarcely be necessary for me to comment further on this case to show that there is no analogy between that case and the case at bar, or to show that observations applicable to that case, which was a case of trespass, would hardly be pertinent to this, which is a case of negligence. It can, however, furnish no precedent for the case in hand.

But again, I am unable to assent to the suggestion that the negligence which caused the injury to the plaintiff is to be considered as the negligence of the defendant himself merely because he happened to be present at the moment of the accident, for the very same reason would require us to hold every passenger in a hackney coach liable for injuries received by third persons through the negligence of the driver, and this latter position is so manifestly untenable that it has never been assumed. For the reasons given, we think the first verdict was clearly contrary to the law and the evidence, and consequently that the court did not err in setting it aside and granting a new trial; and for the same reasons, that there is no error in the judgment of the circuit court on the second trial, and the same is therefore affirmed.

LACY, J., and FAUNTLEROY, J., dissented.

JUDGMENT AFFIRMED.