## Wytheville.

## GRAHAM V. COMMONWEALTH.

### June 10, 1920.

1. CONTINUANCES—*Absence of Witnesses—Relevancy and Materiality of Evidence.*—On a prosecution for homicide, accused expressly and in a most emphatic manner testified that his action in shooting deceased was induced solely by the motive of self-defense. At the time deceased was killed he had the sister of accused under arrest. Accused asked a continuance on account of the absence of material witnesses who would have testified that deceased was actuated in making the arrest and putting accused's sister in jail by personal ill will and malice against her.

    *Held:* That the testimony of the witnesses in question was wholly immaterial to the issues in the case, and there was no error in overruling the motion for continuance.

2. HOMICIDE—*Evidence—Relevancy.*—Where accused testified that he was actuated only by the motive of self-defense in shooting deceased, it was not error to rule out evidence tending to show that deceased who had the sister of accused under arrest at the time of the killing, had been actuated in making the arrest by malice toward her.

3. HOMICIDE—*Rebuttal Evidence—Habit of Deceased as to Using Profanity.*—Where there was testimony for accused, in a prosecution for homicide, that deceased had used violent and abusive language to accused, and had made a demonstration with his hand to get his gun, evidence in rebuttal tending to show that deceased was not in the habit of swearing was of direct probative value as evidence in contradiction of the testimony for the accused, and was therefore admissible.

4. CHARACTER IN EVIDENCE—*Habits.*—Of the probative value of a present habit, or custom, as showing the doing on a specific occasion of the act which is the subject of the habit or custom there can be no doubt. That a negative habit may be shown and not merely an affirmative one seems unquestionable, *i. e.,* that a person systematically omits to do a certain thing.

5. CHARACTER IN EVIDENCE—*Habits.*—Such evidence, of habit or nonhabit, is admissible, as indicating the probability of the doing

or not doing of the act in question, on precisely the same principle that evidence of character or disposition is admissible as evidentiary of the doing or of the non-doing of a human act.

6.  HOMICIDE—*Habit of Deceased as to Swearing.*—The nonhabit of the deceased of swearing is admissible in rebuttal, where an issue of fact has been made by the accused, to the effect that certain conduct of the deceased was such as to justify the killing of deceased in self-defense, and that such conduct was so violent as to be accompanied by profanity.

7.  HOMICIDE—*Profanity of Deceased—Rebuttal.*—Upon a prosecution for homicide where the defense was self-defense, the use of profanity by the deceased not directed against the accused, and which did not influence his conduct, as appeared from his own testimony, was collateral matter, and if objected to by the Commonwealth, would have been inadmissible. But it does not follow that such testimony, erroneously admitted at the instance of the accused, unobjected to by the Commonwealth, could not be rebutted by the latter.

8.  EVIDENCE—*Rebuttal of Inadmissible Evidence.*—If, at the instance of one party, evidence has been admitted, unobjected to, which is immaterial and should not have been admitted, where such action is needed for removing an unfair prejudice which might otherwise ensue from the original evidence, it is a proper exercise of judicial discretion for the trial court to admit evidence from the opposing side in rebuttal of the immaterial testimony which has been thus admitted. A party who draws from his own witness irrelevant testimony, which is prejudicial to the opposing party, ought not to be heard to object to its contradiction on the ground of its irrelevancy.

9.  HOMICIDE—*Instructions—Instructions not Applicable to any Material Issue.*—Where, on a prosecution for homicide, accused testified that his action in shooting deceased was induced solely by the motive of self-defense, it was not error to refuse instructions asked by accused upon the question of accused's right to resist the unlawful arrest of his sister, and upon the duty of deceased to have taken the sister of accused before a judicial officer after her arrest, so that she might have obtained bail or have been committed to jail. Neither of these instructions were applicable to any material issue in the case.

10.  HOMICIDE—*Exhibit of Clothing of Deceased.*—Upon a prosecution for homicide the testimony for accused was to the effect that he was in a certain position when the shots were fired, and the deceased was in a certain position, which was different from that indicated by the testimony for the Commonwealth. The positions of the bullet holes through the clothing and of

102

the right hip pocket of deceased had a material bearing on the question of the position of accused when the shots were fired, and therefore there was no error in the action of the trial court in admitttng the clothing as rebuttal evidence for the Commonwealth.

11. APPEAL AND ERROR—*New Trial—Conflicting Evidence.*—In the instant case the Supreme Court of Appeals having under Code of 1919, sec. 6363, carefully considered all of the evidence in the case, and upon giving the weight to the decision of the jury upon the matters of fact dependent upon the evidence which was conflicting, and which involved the credibility of the witnesses, and upon giving due weight to the action of the trial judge in refusing to set aside the verdict, was of opinion that it did not appear from the evidence that the judgment under review was plainly wrong, or without evidence to support it, and hence the judgment was affirmed.

Error to a judgment of the Circuit Court of Wise county.

*Affirmed.*

In this case the accused was convicted of murder in the first degree and sentenced to be confined in the State penitentiary for life.

The deceased, George Nuckols, was a sergeant or policeman of the municipal corporation of the town of Coeburn, in Wise county, Virginia. On complaint of her husband, George W. Rucker, who was more or less under the influence of liquor at the time, the deceased, without a warrant, arrested Mrs. Rucker, who was a sister of the accused, on the charge of shooting the husband. The arrest was made at night in the pool room of the accused in Bondtown, also a municipal corporation, the place of arrest being, however, within a mile of the corporate limits of the town of Coeburn. The arrest was made in the presence of the accused, who was himself a policeman of the town of Bondtown. The mayor of Bondtown was present in the pool room at the time of the arrest, but there is no evidence in the case that he was applied to to bail Mrs. Rucker, or that

that was thought of by the accused or anyone at the time. And there is no evidence in the case tending to show that the accused considered at the time that the arrest was illegal for lack of a warrant, or for any other cause. It is an uncontroverted fact in the case that Mrs. Rucker submitted to the arrest, as did the accused. The testimony for the accused, it is true, is that the deceased said at the time that he had a warrant for Mrs. Rucker, that she asked what the warrant charged, but the deceased did not show the warrant, but said, "It don't make any difference, by God, let's go." That the accused offered "to guard Mrs. Rucker," or "do anything to keep (her) from having to go in the lock-up that night;" that the accused both then, and after reaching the Coeburn jail, made these offers, and offered "a cash bond" to the deceased; but that all these offers were declined by deceased, saying, according to testimony for the accused, that he did not think the accused "had enough cash to keep (Mrs. Rucker) from going (to jail), and that he was going to lock (her) up that night." The testimony for the accused is also to the effect that at the time of the arrest the deceased, in the presence of the accused, used extremely abusive and indecent language to Mrs. Rucker, swearing and handling her very roughly. But there is no testimony, even for the accused, that he resented this except momentarily when he kept his resentment to himself, and it passed off before the homicide, at least to such an extent that it exerted no influence on the conduct of the accused, as he himself testified, and it appears affirmatively in evidence that the accused had no purpose to interfere with the arrest. On the contrary, the testimony for the accused concurs with that for the Commonwealth to the effect that the accused went along with the deceased, and Mrs. Rucker to the jail with the declared purpose only of trying to effect the giving of bail for her in the town of Coeburn and releasing her from custody on bail that night.

The testimony for the Commonwealth does not disclose the details of what occurred in the pool room at the time of the arrest. Rucker, a witness for the Commonwealth, testified that he went with the deceased officer to the pool room on his errand of making the arrest, but that the witness did not go inside or hear what was said in the pool room. But he testifies that "After they came out they talked a little bit about leaving her in John's (the accused's) custody, or something like that, and he bringing her in next morning, he was police too, but Mr. Nuckols said he would not do that, he would have to keep her in charge himself. He may not have said it exactly that way, but that was what he meant.

Q. State what his manner was, was he rough or considerate? * * *

A. I didn't see anything of any roughness out of him at all. He apparently was in a mild good humor as anybody. I was with him."

This witness testified as to what occurred after the arrest and at the time of the homicide as follows:

"Mr. Nuckols arrested her and took her back to Coeburn, and John went with him down there, and I went myself. John went back to Coeburn with us, and before we got to the calaboose, he went down in town and left us; he left us and went down in town to get her bond fixed. By the time we got to the calaboose and stopped there he came back and said he did not find anybody, but said he would sign the bond himself, and mine both, and I told him I would sign them both, too. Mr. Nuckols said he could not set the bond, I don't know exactly what he said—that is what he meant, that the mayor would have to do that, and he was not there in town. Mr. Nuckols said he would have to lock her up until the mayor came and set the bond.

"Q. Then what was done?

"A. Then Mag talked to Nuckols and accused him of in-

sulting her on an arrest he made before this; and Mr. Nuckols said that he did not do it, that he treated her nice, as nice as he could, she disputed his word, and then he told her, say 'Mrs. Rucker, I will not tell you what kind of a woman you are,' he says, 'You are the lyingest woman I have ever seen, you would swear a man's life away, I would not believe you on oath.' When he said that John shot him.

"Q. Where were the parties standing at the time the first shot was fired?

"A. My wife and myself were just inside the hall door at the calaboose at Coeburn, and Mr. Nuckols was on the outside standing talking to Mag, close to her, and John was on the porch a little ways, could not be far, the porch was small, I don't know how far, but on the porch.

"Q. State whether or not at that time, before the shooting, any conversation had occurred between Mr. Nuckols and the defendant?

"A. Nothing except the bond conversation that I heard. Nothing except that John proposed to sign the bond, and Nuckols said he could not take the bond, that the mayor would have to set it. That was at the place the shooting took place.

"Q. What was Nuckols doing at the time Graham shot him?

"A. He was talking to my wife.

"Q. Did he have anything in his hand?

"A. He had a little flash light in one hand and was laying it off to her like that (indicating motioning hand) with the other.

"Q. Was he looking at Graham?

"A. Looking at my wife.

"Q. Graham was standing off to the side?

"A. Yes, off to the side a little bit.

"Q. Where did the shots take effect on Nuckols' body?

"A. I could not tell you where the first shot did hit.  I never seen the bullet holes at all.

"Q. What did Nuckols do when the first shot was fired?

"A. When the first shot was fired, Nuckols turned just like that (indicating) and said "Lord have mercy," and started to fall and fell on down.

"Q. How many shots were fired by Graham before Mr. Nuckols fell?

"A. Two.

"Q. After that what did the defendant do, if anything?

"A. After he fell down John stepped one step and reached down that way (indicating) and shot two more shots.

"Q. State whether or not the defendant said anything then?

"A. If he did I never heard him; if he spoke I never heard him.

"Q. What did the defendant do after the shooting?

"A. He turned and ran off."

Another witness for the Commonwealth, Gray, who was no relation to any of the parties, testified that he was near by when the homicide occurred, and saw the tragedy enacted. His testimony, so far as material to be noted, is as follows:

"They had some lights at the calaboose, and I noticed Mrs. Rucker and Mr. Rucker and Mr. Nuckols step to the platform—they had flash lights—they stepped on the little platform, place to go in with a little railing around the platform to the calaboose, and as he opened the door that woman says, 'You have been treating me dirty when you arrested me before,' for beating the child up.  Mr. Nuckols says, 'I don't want to hear you say that.  I didn't treat you dirty, I treated you the way I was bound to do to discharge my duty.'  At that time I saw Mrs. Rucker and Mr. Rucker both went in the hall of the calaboose, went right in the door, and I saw Mr. Graham on steps leading to this platform, and he says, 'Seems to me that you ought to let her

out on bail, I will get somebody to go on the bond,' or something like that, and Mr. Nuckols remarked, says, 'You know, John, I cannot do it, Mr. Crockett is not here, Mr. Kilgore and nobody,' all the lawyers gone to that convention at that time you know, the woman kept saying something, Mr. Graham reached in his pocket, I saw plain on the steps of that Calaboose, and fired two shots at him, about that time Mr. Nuckols seemed to be reaching his hand to close the door to the calaboose; at that time he put his hand to his head and says, 'Lord, oh Lord,' or 'Oh Lord,' or 'Oh God,' something that way, and sunk to his knees, and Mr. Graham advanced three or four steps to the end of the platform, and then he says, 'You son of a bitch, I have got you where I want you,' and fired two more shots, and he got off that platform and run through the alley.

*       *       *       *       *       *

"Q. What was Mr. Nuckols doing at the time Mr. Graham fired the first shots—who was he talking to, if anyone?

"A. He was talking to that woman, if I am not mistaken —I am pretty sure of it.

"Q. Mrs. Rucker?

"A. Yes, sir.

"Q. Did you see whether he had anything in his hand at that time, what he was doing with his hands?

"A. He had his hand trying to reach to the door to close the door, didn't have nothing in his hand, didn't reach for any arms nor nothing like that. That is the way I saw it."

The testimony of the accused, as a witness in his own behalf, giving an account of the arrest, and what then and thereafter occurred, including the homicide, is as follows:

"Q. Tell the jury in your own way how the shooting occurred, beginning at the time Policeman Nuckols came to your place after your sister?

"A. At the time of his arrival at my house I was there at the pool room, playing a game of pool with Harry Dixon.

I was running the pool room. Mr. C. T. Akers was sitting by, the mayor of Bondtown. Mr. Nuckols came to the door as if he wanted to kick it down, the way I took, the door flew open and there he stood, and I says, 'Come in out of the weather,' and he stepped inside the door and says, 'Is Mrs. Rucker here,' and I says, 'Yes,' and showed him where she was sitting by the fire in the back room, no door, just a curtain, I wanted to see what he wanted her for. He walked up to Mrs. Rucker, and stopped, and put his hand up against the wall or door, you might say as if to rest, and put the other hand about some part of his body, and says, 'I have got a warrant for you, Mag,' and she says something to the effect, asking him some way what for, adding the word 'Lord' to it, 'Lord, what you got a warrant for me for,' and he says, 'Never mind, you know what it is for,' and ordered her to get up and let's go. She says, 'Let's see the warrant,' and he says, 'Never mind about that, let's go.' She began to be slow about getting up, you might say, she was cold and wet, but she got up finally and stepped back, when she raised from the chair and stepped back a couple of steps, he took her by the arm, and there was a wash-stand back there, and he jerked her against that piece of furniture. He turned her loose, and she gets her coat and starts, and they get in front of the way he came in, in the pool room, and I says to him, 'Well, if you have really got her arrested let me go her bond until morning,' 'It's too late to try her now, and its cold and wet.' He says, 'I will see about that.' I says, 'I guess the bond will not be much, I will give you a cash bond, give you cash for it until morning,' He says, 'By God, we will go.' I carried my cue stick in my hand, never aimed to go to Coeburn; he asked me in a rough manner, says, 'By God, go down with us,' and I says, 'I aint got no business,' and he turned around to catch her, says 'God damn, come on and go down,' and I says, 'Wait until I tell the man I am playing with,

I will go with out.' So I pitched the cue stick up and says, 'I will give you that game, I am going to Coeburn with Mr. Nuckols, and he says, 'I will pay you for the game you beat me,' and pitched the money out on the pool table, and I picked it up and turned to go out the door. Somebody's umbrella was sitting there, and I picked it up when I got to the door where I expected to find Mr. Nuckols, where I asked him to wait, and I guess they were the distance of fifty yards down the road. When I came up to them he had her by the hand, and she said, 'he would not let me wait for you, he is dragging me along,' and I says to her, 'if you would walk along with him, you would not have to be dragged.' They went along, and he was cursing and telling her what kind of a lying slut and whore she was. I did not speak but one word, said 'You ought not to talk that way.' Me and my sister, Mr. Rucker and Mr. Nuckols were walking along and we came to where this street forked, Straight street went down what you might call a back alley, and Front street went around that way. I left them there and said I would go around to Mr. Crockett's office, and he said, 'By God, go ahead.' I went up to the office and it was locked and dark. I came back on the street to see if I could see somebody to ask about it. I came back to the bank and stood there a few minutes thinking somebody would show up and I would ask. Well, I thinks to myself, he has put her in jail and gone on home, and I will go out and ask her how she is fixed, she is wet and he has done put her in jail, I will see if she has got any fire. So I went out.

"I was on the other side of the street from the calaboose when I heard the loud talking, and crossed. There is a pair of scales down there and I walked even with the scales and turned and walked across the scales on down to the calaboose and up on the porch. He was standing there, was not pretending to close the door, or anything, but was talking. I stood there three to five minutes before I said a word,

103

Nobody acknowledged my presence, and I never made any noise that I was there by speaking. I had the flash light in my hand, and the umbrella in my left hand. Eventually I says, 'Mr. Nuckols, you have no right to talk to that woman that way.' I says, 'If this country produces any ladies that is one of them, and besides she is my sister, and I do not want you to talk to her that way.' He spoke and says, 'I am an officer,' and I says, 'So am I,' and he says, 'No, you are nothing but a God damned son of a bitch,' and when he said that he put his hand back on his hip and I saw a bright metal looked like a pistol right there. I turned the umbrella and flash light loose, the umbrella you might say, rolled down my back and I pulled my pistol and intended to hit him on the hand, so I fired five shots in rapid succession without knowing where I was hitting or anything about it.

"Q. Did you see him fall?

"A. No, sir, it was dark and I could not see."

\*        \*        \*        \*        \*        \*

"Q. Would you have shot George Nuckols if he had not made this attempt and you had not thought he was intending to kill you or do you serious injury?

"A. If I had not thought he was going to shoot me, I would not have shot him. When he started for his pistol I was just like most fellows, thought I felt the bullets hitting me, whether he shot or not.

"Q. Can you tell the jury why you shot more than one shot?

"A. Well, I could not hardly in a way explain it. I can say this, I did not know whether any one of the shots hit him or not. I fired until the pistol was empty; my thought was to shoot him, I fired five shots all that here in the gun."

\*        \*        \*        \*        \*        \*

Cross-Examination.   By Mr. Bruce.

"Q. You heard Mr. Nuckols cursing your sister at that time?

"A. Yes, I was standing right by.

"Q. You heard him calling her these names you have repeated to the jury?

"A. Didn't call her as many names there as he did later, there at home.

"Q. You heard him call her names later?

"A. Yes, sir.

"Q. Did it make you mad?

"A. In one instance it made me mad; hurt my feelings.

"Q. You permitted it?

"A. Yes, I took it and said nothing about it.

"Q. Did you continue to be mad?

"A. No, sir, not in a way, it flashed over me—He ought not to have come in my house and treated my sister like that. I realized that he was an officer and I was and I did not want to get any hardness between me and him, and I didn't say a word.

"Q. You permitted him to go ahead?

"A. Yes, sir.

"Q. He started down the road then with your sister from there?

"A. When they started from the house, I asked him to wait a minute out there until I told the man that I was going with him. Just a few steps out there, and when I came back he was fifty yards down the road.

"Q. And you went on and overtook them?

"A. Yes, sir.

"Q. And went with them on down and went around to Mr. Crockett's office?

"A. Yes, sir.

"Q. And didn't find him?

"A. No, sir.

"Q. Then you went up to the calaboose and there you found them standing at the door of the calaboose?

"A. Yes, sir.

\*　　　\*　　　\*　　　\*　　　\*　　　\*

"Q. Did you say anything else?

"A. The next say was his.  He says, 'I will give you to understand I am an officer?' and I says, 'So am I,' and he threw his hand back for the gun, I had a flash light——

"Q. Where did he have his hand?

"A. Back here (indicating).

"Q. And you thought he was going to shoot you?

"A. Yes, sir.

"Q. And that is the only reason you had for shooting him?

"A. Yes, sir.

"Q. You were not prompted by any other motive?

"A. Well, he called me a God damned son of a bitch, and squared himself to face me, and threw his hand back like that I saw the bright piece on the pistol.

"Q. And you shot him because you thought he was going to shoot you, of course?

"A. Yes, sir.

"Q. You never shot him because he called you a son of a bitch?

"A. No, sir.

"Q. You did not shoot him for anything he said, but shot him because he was going after his pistol?

"A. Yes, sir.

"Q. Did not shoot him because he called your sister what you said, but because he was going after his pistol?

"A. Yes, sir.

"Q. You thought your own life was in imminent danger and you shot him for that reason?

"A. Yes, sir.

"Q. And that was the only reason you shot him?

"A. Yes, sir.

"Q. And you started to go away immediately afterwards?

"A. Yes—Well, it was, you might say, a minute or minute and a half, you might say. I was like the old saying, kindly addled, was on the ground and didn't know where I was at."

The other material facts and proceedings appear from the opinion below.

*D. F. Kennedy,* for the plaintiff in error.

*Jno. R. Saunders, Attorney-General; J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile,* for the Commonwealth.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

There are six assignments of error which will be disposed of in their order as stated below.

[1]  1. That the court below erred, "In overruling the motion of petitioner for a continuance of the case on account of the absence of material witnesses who had been duly summoned and were not in attendance on the court."

The testimony of these witnesses, as appears from the record, would have tended, at most, only to show that the deceased was actuated in what he did in the arrest and the taking of Mrs. Rucker to jail, and in the act of putting her therein at the time he was killed, by personal ill will and malice against her, and not by the *bona fide* purpose of discharging his duty as an officer. But even if it were granted that such was the motive of the deceased, the accused nowhere claims in his testimony that such motive in any way influenced his action in committing the homicide.

On the contrary the accused expressly and in the most emphatic manner testified that his action in shooting the deceased was induced solely by the motive of self-defense. The testimony of the witnesses in question was therefore wholly immaterial to the issues in the case, as the learned judge of the court below held, and, hence, there was no error in the action of such court in overruling the motion for continuance on account of the absence of such witnesses.

[2]   2. That the court below erred, "In ruling out the evidence of George Rucker, a witness for the Commonwealth, and not permitting him to testify as to the facts concerning the difficulty between him and his wife * * * for which she said (the deceased) had arrested her * * Thereby depriving petitioner of the right to show to the jury that the arrest was made by (the deceased) on account of malice toward the said Maggie Rucker, and not upon reasonable cause to suspect that felony had been committed, there being no claim or contention that a misdemeanor had been committed by her in the presence of the officer making the arrest."

For the same reason stated in the consideration of the first assignment of error, there is no merit in this assignment of error.

[3-5]   3. That "the court erred in admitting evidence on behalf of the Commonwealth over the objection of petitioner as to the good habits and good character of the deceased * * to rebut the evidence of the petitioner and his witnesses which was to the effect that (the deceased) at the time he arrested Maggie Rucker * * used violent and abusive language and profane language to her on said occasion, and that at the time of the killing the (deceased) had used violent, abusive language to petitioner and advanced toward him and made a demonstration with his hand to get his gun."

The testimony in question was that of a number of witnesses to the effect that they had known the deceased intimately for varying lengths of time, and that they never heard him make use of an oath.

There was testimony of witnesses for the accused, other than that of himself, and also his own testimony, to the effect stated in this assignment of error, which testimony was introduced by the accused without objection on the part of the Commonwealth. Now in so far as such testimony was not "collateral" and was admissible in evidence in behalf of the accused, had it been objected to by the Commonwealth, the rebuttal testimony in question was unquestionably properly admitted as tending to show the non-habit of swearing as pertaining to the deceased, which was of direct probative value as evidence in contradiction of the testimony for the accused on the subject. 2 Wigmore on Ev., secs. 1001, 1003. And——

As said in 1 Wigmore on Ev., sec. 93: "Of the probative value of a present habit, or custom, as showing the doing on a specific occasion of the act which is the subject of the habit or custom, there can be no doubt. Every day's experience and reasoning makes it clear enough."

Again, *Idem,* sec. 376: "That a negative habit may be shown and not merely an affirmative one seems unquestionable, *i. e.*, that a person systematically omits to do a certain thing * * "

Such evidence, of habit or non-habit, is admissible, as indicating the probability of the doing or not doing of the act in question, on precisely the same principle that evidence of character or disposition is admissible as evidentiary of the doing or of the non-doing of a human act. 1 Wigmore on Ev., secs. 51, 55, 63, 68, 375.

As said in the learned work just cited (sec. 68): "When the character offered is that of a third person, not a party to the cause, the reasons of policy (noted *ante,* sec. 64)

for exclusion seem to disappear or become inconsiderable; hence if there is any relevancy in the fact of character, *i. e.*, if some act is involved upon the probability of which a moral trait can throw light, the character may well be received."

[6]    The same principle applies, we think, to evidence of the non-habit of the deceased of swearing, introduced in rebuttal in the case, where the issue of fact had been made by the accused, to the effect that certain conduct of the deceased was such as to justify the killing in self-defense, and that such conduct was so violent as to be accompanied by profanity.

[7, 8]    Accurately speaking, however, only the *factum* of the use of the profanity by the deceased at the time that the accused claimed that the deceased made the hip-pocket movement was material in the case in judgment; since the other alleged profanity was not directed against the accused and did not influence his conduct as appears from his own testimony. The other testimony for the accused on the subject of the use of profane language by the deceased was, indeed, "collateral matter," and such testimony would, strictly speaking, have been inadmissible had it been objected to by the Commonwealth. But it does not follow that such testimony, erroneously admitted at the instance of the accused, unobjected to by the Commonwealth, cannot be rebutted by the latter. Another principle comes into operation in such case.

In the nature of things, in the progress of trials in the *nisi prius* courts, it would be too much to expect the judge to be more vigilant than counsel and to unerringly act in admitting testimony to which no objection is interposed. And it is well settled that if, at the instance of one party, evidence has been admitted, unobjected to, which is immaterial and should not have been admitted, "where such action is needed for removing an unfair prejudice which might otherwise ensue from the original evidence," it is a proper

exercise of judicial discretion for the trial courts to admit evidence from the opposing side in rebuttal of the immaterial testimony which has been thus admitted. 1 Wigmore on Ev., sec. 15 (3). In such case, "A party who draws from his own witness irrelevant testimony, which is prejudicial to the opposing party, ought not to be heard to object to its contradiction on the ground of its irrelevancy." 29 Am. & Eng. Ency. Law, 793-4. See to the same effect *Sisler* v. *Shaffer,* 43 W. Va. 769, 770-1, 28 S. E. 721; *McIntyre* v. *White,* 124 Ala. 177, 180, 26 So. 937; *Grafton Bank* v. *Woodward,* 5 N. H. 301, 309; *Fuller* v. *Valiquette,* 70 Vt. 502, 503-4, 41 Atl. 579. This furnishes a well established exception to the wholesome, and indeed necessary, rule that the time of courts will not be allowed to be occupied in the trial of collateral issues by allowing the introduction of rebuttal testimony thereon.

It is true that the holding in *Bowles' Case,* 103 Va. 816, at p. 829, 48 S. E. 527, on the point under consideration (which case is cited and relied on for the accused), is contrary to the conclusion above reached; but that was only one among other grounds on which that case was reversed, and, as appears from the opinion, no authority was cited or before the court to sustain the view of the Commonwealth as to the admissibility of the evidence, and but brief treatment was given the subject in the opinion, so that it is manifest that the court did not feel that it was necessary to, nor did it fully consider it. In view of the authorities above mentioned which were not before the court in the *Bowles Case,* we feel constrained to disapprove of the holding of that case on the point we have now under consideration, and such holding is hereby overruled. Our conclusion, therefore, is, that there was no error in the action of the trial court in admitting in rebuttal, as aforesaid, the evidence touching the non-habit of the deceased in the matter of profanity.

[9]    4. That the trial court erred, "In refusing instructions number one and two offered by petitioner."

One of these instructions was to the effect that the deceased officer had no right to arrest Mrs. Rucker without a warrant, unless he had reasonable cause to suspect that a felony had been committed by her, and that the accused had the right, acting in defense of his sister, to resist an unlawful arrest of the latter.

The other instruction was to the effect that it was the duty of the deceased to have taken Mrs. Rucker, after her arrest, before a judicial officer without any unnecessary delay, where she might have obtained bail or have been committed to jail, as the case might be.

The refusal of these instructions was not error for the reason that neither of them were applicable to any material issue in the case. According to the testimony of the accused neither of these matters had any influence whatsoever on his conduct in killing the deceased.

[10]    5. That the court erred in permitting the Commonwealth, over the objection of the petitioner, "to exhibit the clothing of the deceased * * to the jury after the Commonwealth and defendant had closed in chief, without any reason therefor and no claim having been made that any circumstances had been brought about or developed by the evidence which would necessitate the exhibition of the clothing, there being no dispute as to the number of shots fired, or as to the range of the shots in the body of the deceased."

According to the testimony for the Commonwealth of the undertaker, one or more of three bullets, which entered the body of the deceased, caused his death. A fourth bullet struck the right hand of the deceased, which the accused claimed was reaching for the hip pocket of deceased. The latter bullet "tipped" the end of the middle finger of the right hand and wounded the thumb of that hand of the de-

ceased. Two of the three bullets first mentioned pene-
trated some parts of the clothing. The undertaker, when
on the witness stand in chief, testified in detail about these
matters, but he did not have the clothing with him at the
time, having it at his place of business, as he testified.
Thereupon, one of the attorneys for the prosecution stated
to the court, "I think your honor, we will want the cloth-
ing. Mr. Midley" (the witness) "was not summoned or
notified to bring it, and it may become necessary to have
it, and if so, we will want to offer it in evidence." The
court: "Of course I cannot tell what may develop."

After this witness left the stand the testimony for the ac-
cused and of the accused himself was introduced, to the
effect that he was in a certain position when the shots were
fired, and that the deceased was in a certain position, which
was different from that indicated by the testimony for the
Commonwealth.

The positions of the bullet holes through the clothing, and
of the right hip pocket, had a material bearing on the ques-
tion of whether the accused was in such a position that he
could have seen "The bright metal looking like a pistol
right then," with the right hand of the deceased on it in
his hip pocket, etc., etc., as he testified was the situation at
the time he commenced shooting, and we find no error in
the action of the trial court in admitting the clothing as
rebuttal evidence for the Commonwealth.

[11]    6. The last assignment of error is that the trial
court erred, "In refusing to set aside the verdict of the
jury and grant the petitioner a new trial because the same
is contrary to and not supported by the evidence."

Of this assignment of error we deem it sufficient to say
that we have, under Code 1919, sec. 6363, carefully con-
sidered all of the evidence in the case, and upon giving the
weight to the decision of the jury upon the matters of fact
dependent upon the evidence which is conflicting and which

involves the credibility of the witnesses (*Muse* v. *Stern,* 82 Va. 33, at p. 39, 3 Am. St. Rep. 77), and, along with this, also upon giving due weight to the action of the trial judge in refusing to set aside the verdict (*Almond* v. *Wilson,* 75 Va., at p. 626, to cite only two of the many cases bearing on the subject), we are of opinion that it does not appear from the evidence that the judgment under review is plainly wrong, or without evidence to support it, and hence such judgment will be affirmed.

*Affirmed.*