COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Frank and Humphreys
Argued at Richmond, Virginia


KENNETH ALONZO HODGES, II

                                                        OPINION BY
v.        Record No. 0120-04-2               JUDGE LARRY G. ELDER
                                                        JUNE 7, 2005
COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF HALIFAX COUNTY
                           William L. Wellons, Judge

            Frank K. Friedman (Glenn L. Berger; Woods Rogers PLC; Berger &
            Thornhill, on briefs), for appellant.

            Amy L. Marshall, Assistant Attorney General (Jerry W. Kilgore,
            Attorney General, on brief), for appellee.


        Kenneth Alonzo Hodges, II (appellant), appeals from his jury trial convictions for murder

and use of a firearm in the commission of murder.  On appeal, he contends the trial court

erroneously (1) admitted certain out-of-court statements in violation of the Confrontation Clause

and Virginia's hearsay rule; (2) admitted unduly suggestive and tainted out-of-court and in-court

identifications; (3) denied his motions for mistrial based on prosecutorial misconduct; and

(4) concluded the evidence was sufficient to support his convictions.  We hold the trial court's

admissions of the challenged statements, only some of which were admitted for their truth, and

the eyewitness identifications did not constitute reversible error.  We hold further that the trial

court did not abuse its discretion in denying appellant's motions for mistrial.  Finally, we

conclude the circumstantial evidence was sufficient to support appellant's convictions.  Thus, we

affirm.

I.

BACKGROUND

On Sunday, September 1, 2002, Shelly Marie Jackson (the victim) failed to return home as scheduled. On Wednesday, September 4, 2002, police found Jackson's body on property owned by appellant's father. Evidence adduced at trial established the following:

On March 24, 2002, Jackson reported a burglary at her apartment. Police Lieutenant Brian Lovelace, who investigated the report, received "information in from other people that" Jackson had had a gun and a safe taken in the burglary and that Jackson was distributing marijuana for appellant from her apartment. As a result, Lt. Lovelace also was investigating appellant. Lt. Lovelace ultimately recovered a safe and a gun from a Kenneth Edmunds, who made a statement to Lt. Lovelace. On March 28, 2002, Jackson denied Lovelace's assertions that she was selling marijuana and that a safe and firearm had been taken in the burglary, but she gave consent for a search of her apartment, which yielded marijuana.

On March 29, 2002, police executed a search warrant for appellant's residence. During that search, police found half a box of 9 millimeter ammunition in appellant's house under the bed in the master bedroom.

On April 17, 2002, Lt. Lovelace advised Jackson that he had enough evidence, including the statement from Edmunds, to charge her even without her own admission. Jackson then made a written statement[1] in which she said she had been selling marijuana for appellant and that he had supplied her with a safe and a gun to keep in her apartment.

Lt. Lovelace then obtained warrants charging Jackson with distributing marijuana and charging appellant with conspiracy to distribute marijuana. On April 18, 2002, appellant was

_____

[1] Appellant filed a motion *in limine* to exclude Jackson's written confession. See discussion, infra, Section II.A.4.

- 2 -

arrested on that warrant and released. One of the conditions of his bond was that he have no contact with Jackson.

Sometime before appellant's June 24, 2002 preliminary hearing on the drug conspiracy charge, Lt. Lovelace talked to Jackson about "turning state's evidence" against appellant. The day prior to the preliminary hearing, either appellant or his wife, Shanetta, "called [Jackson] and said they needed to meet." Jackson's cousin, Shelly Jones, accompanied Jackson to Cody's Store, where Jackson said "she was going to meet [appellant] to talk to him about court."[2] When Jackson and Jones arrived at Cody's Store, Jones waited in the car while Jackson climbed into appellant's truck and spoke to his wife. Appellant was not in the truck, but before Jackson completed her conversation with Shanetta, Jones saw appellant pacing back and forth on a nearby sidewalk. Also on June 23, 2002, Jackson apparently signed a statement, written in someone else's handwriting, saying she implicated appellant in her earlier confession because the police pressured her into doing so and that what she said about appellant was not true.

On June 24, 2002, Jackson appeared at appellant's preliminary hearing with her attorney, Tracy Quackenbush, but chose not to testify. As a result, some of the charges against appellant were dismissed. However, after Jackson's preliminary hearing, Lt. Lovelace thought Jackson might change her mind about testifying against appellant. Lt. Lovelace said that, as a result, the Commonwealth planned to indict appellant at the September 2002 term of the grand jury.

Prior to any indictment, Attorney Quackenbush received a copy of the statement Jackson had made to Lt. Lovelace on April 17, 2002. Quackenbush also received a call from the Commonwealth's Attorney's office indicating that "if [Jackson] did not cooperate[,] . . . the Commonwealth would be seeking a jury trial and would plan to bring on conspiracy charges and

---

[2] Appellant objected to the introduction of a portion of this testimony at trial. See discussion, infra, Section II.A.3.

possibly another charge." On Friday, August 30, 2002, Quackenbush advised Jackson of the risks of not testifying about the contents of her confession and said "she should seriously consider cooperating." Quackenbush reported the conversation to the Commonwealth's Attorney, but she never received a final answer from Jackson about what Jackson intended to do.

That evening, Jackson's brother answered the phone at Jackson's mother's house. Appellant's wife was on the phone and wanted to speak to Jackson, but Jackson was not there.

On Saturday, August 31, 2002, Jackson told her cousin, Missy Jones, she "was going to" testify at appellant's trial and "that she didn't really want to testify, but she had to."[3]

At 11:00 a.m. on Sunday, September 1, 2002, appellant used his cell phone to call Jackson at the residence she shared with her sister, Angela Jackson. Immediately thereafter, Jackson dressed herself and her two-year-old daughter, and they drove away from the residence in Jackson's car at "close to eleven-thirty." That same morning, Jackson telephoned her friend, Farah Canada, and asked Canada to watch her daughter, as Canada often did. At around 12:00 noon, Jackson dropped her daughter off at Canada's and said she was going to meet appellant "down the dirt road past [appellant's] house."[4] Jackson said "she would be right back" and drove off in her car. Jackson never returned.

Later that same day, police in Reidsville, North Carolina, located Jackson's car at a Ramada Inn. On Monday, September 3, 2002, "it was still positioned in the same place." The location where the car was found was about 58 miles from where Jackson's body later was found and took about one hour seven minutes to reach by car.

---

[3] Appellant objected to the introduction of this testimony at trial. See discussion, infra, Section II.A.3.

[4] Appellant filed a motion *in limine* to exclude this testimony at trial. See discussion, infra, Section II.A.3.

On the evening of Monday, September 2, 2002, Angela Jackson reported her sister's disappearance to the police. The investigator who took Angela Jackson's statement retrieved a particular telephone number from the home's caller i.d. device. When the investigator dialed the number, she reached appellant on his cellular telephone. Appellant told the investigator "he kept that phone with him all the time" "unless it's on the charger inside the home."

On Wednesday, September 4, 2002, the police looked for Shelly Jackson's body on a piece of land owned by appellant's parents on which appellant lived. As they walked down a path in that area, they saw lying on the ground "a white plastic piece that a lady would use in her hair." In the same "little area," they found a pocketknife, a dark stain later identified as blood, and an earring later identified as one Jackson had been wearing when she left her residence on Sunday, September 1, 2002. Nearby, they located Jackson's body. On the ground within a six-to-eight-foot radius of Jackson's body, the police found three Winchester 9 millimeter caliber shell casings. It was later determined that Jackson died of gunshot wounds to her head and right thigh. The medical examiner was unable to determine what type of gun caused Jackson's injuries. The precise date and time of Jackson's death also were not determinable.

At the time of Jackson's death, she was pregnant. The father of her unborn child was a man named Roger Owen. Owen was "staying back and forth with his father in North Carolina and his mother . . . in South Boston[, Virginia]." Police interviewed Owen on at least two occasions after Jackson's death, but Investigator Sheldon Jennings, who spoke to him on one of those occasions, testified, "I don't think he was a suspect."

After Jackson's body was found on Wednesday, September 4, 2002, Halifax investigators traveled to the Ramada Inn in Reidsville, North Carolina, where Jackson's car had been found. Adjacent to the Ramada Inn was a Chevron gas station and convenience store. The investigators spoke to cashier Mohammed Al-Rammal, who selected appellant's photograph from a photo

array and said appellant had come into the store on Sunday, September 1, 2002, between about 2:00 and 4:00 p.m.[5] At trial, Al-Rammal again identified appellant as a person who had come into the store on the afternoon of Sunday, September 1, 2002. Appellant attempted to impeach Al-Rammal's testimony with a video surveillance tape from the convenience store, but the time and date stamps on that tape indicated the tape for September 1, 2002, "start[ed] at five" p.m. and did not show what happened in the store between noon and 4:00 p.m.

DNA analysis of blood found on the ground at the murder scene indicated that Jackson could not be eliminated as having been a contributor to the DNA. The hair pick bore evidence of Jackson's DNA and the DNA of a third party other than appellant. DNA found on the gear shift of Jackson's car, determined not to belong to Jackson, also did not belong to appellant. DNA found under Jackson's fingernails did not belong to appellant. Examination of the knife yielded no visible blood, but swabs of the rubber grip area of the knife yielded a "mixture" of DNA, indicating more than one individual contributed to the DNA on the knife. Forensic analysis eliminated Jackson as a possible contributor of the DNA on the knife. However, the Commonwealth's evidence was that appellant could not be eliminated as a contributor, and statistical analysis indicated it was "[b]illions of times more likely" that appellant was one of the contributors to the DNA on the knife grip as opposed to some unknown individual. Appellant presented a contrary opinion from an expert who testified that the DNA evidence excluded appellant as a contributor to the DNA on the knife.

On September 10, 2002, about 150 feet from where Jackson's body had been found, investigators located a large hole, which one of the investigators referred to as "a make-shift

---

[5] Appellant moved prior to trial to suppress the out-of-court identification and also sought to prevent any in-court identification. See discussion, infra, Section II.B.

grave."[6] The hole itself was eleven inches deep and contained "a small amount" of "standing

water." Rainfall records admitted at trial established that the area experienced a rainfall of 2.01

inches between 7:00 a.m. on Saturday, August 31, and 7:00 a.m. on Sunday, September 1, 2002.

Between 7:00 a.m. on Sunday, September 1, and 7:00 a.m. on September 11, the day after the

investigators found the hole, the area had only 0.04 inch of rain.

Evidence regarding appellant's and his wife's cellular telephone records for the afternoon

of Sunday, September 1, 2002, showed four calls from appellant's cell phone to his home

between 12:40 and 1:00 p.m. Beginning shortly after 1:00 p.m., numerous calls were placed

between appellant's and his wife's cell phone. Those calls were carried by cellular telephone

"switches" beginning in the South Boston area; passing through the Danville "switch" area at

1:29 p.m. and the Henderson, North Carolina, "switch" area at 1:38 p.m.; and ending in the

Reidsville, North Carolina, "switch" area, where several calls were made between 1:57 p.m. and

2:14 p.m. Those calls showed appellant's cell phone accessed switches in North Carolina before

his wife's did.

The jury convicted appellant of the charged offenses, and he noted this appeal.

II.

ANALYSIS

A.

THE CONFRONTATION CLAUSE AND STATE HEARSAY RULES

1. Confrontation Clause

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal

prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

---

[6] Appellant objected immediately after that testimony, but he did not specify the basis for his objection and did not request that the testimony be stricken.

him." U.S. Const. Amend. VI. The Supreme Court "has held that this bedrock procedural guarantee applies to both federal and state prosecutions." Crawford v. Washington, 541 U.S. 36, 42, 124 S. Ct. 1354, 1359, 158 L. Ed. 2d 177, 187 (2004). The Supreme Court's recent decision in Crawford "changed the legal landscape for determining whether the admission of hearsay statements violates the accused's right[s] under the Confrontation Clause." Horton v. Allen, 370 F.3d 75, 83 (1st Cir. 2004), quoted with approval in United States v. Hendricks, 395 F.3d 173, 177 (3d Cir. 2005). As set out in Crawford, if a statement is testimonial in nature, "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Crawford, 541 U.S. at 68, 124 S. Ct. at 1374, 158 L. Ed. 2d at 203 (rejecting other, more "amorphous" methods for determining reliability of testimonial statements).

Although the Court has not "spell[ed] out a comprehensive definition of 'testimonial,'" it has held "the term . . . applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a formal trial; and *to police interrogations*." Id. (emphasis added). "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." Id. at 51, 124 S. Ct. at 1364, 158 L. Ed. 2d at 192.

"[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." Id. at 59 n.9, 124 S. Ct. at 1369 n.9, 158 L. Ed. 2d at 197 n.9. "The [Confrontation] Clause . . . [also] does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Id. (citing Tennessee v. Street, 471 U.S. 409, 414, 105 S. Ct. 2078, 2081-82, 85 L. Ed. 2d 425, 431 (1985)); see also, e.g., People v. McPherson, 687 N.W.2d 370, 376-77 (Mich.

Ct. App. 2004); State v. Clark, 598 S.E.2d 213, 220 (N.C. Ct. App. 2004); State v. Mack, 101 P.3d 349, 352 (Or. 2004).

Whether the admission of non-testimonial hearsay implicates the Confrontation Clause is unclear in the wake of Crawford. 541 U.S. at 61, 124 S. Ct. at 1370, 158 L. Ed. 2d at 199 (holding that "we need not definitively resolve [this question] today, because [the statement to police at issue] is testimonial under any definition" and that the Confrontation Clause requires of non-testimonial hearsay, at most, that it meet the test of Ohio v. Roberts, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980)). The Confrontation Clause requires of non-testimonial hearsay, at most, that "an unavailable witness's out-of-court statement . . . has adequate indicia of reliability--*i.e.*, falls within a 'firmly rooted hearsay exception' or bears [other] 'particularized guarantees of trustworthiness.'" Id. at 42, 124 S. Ct. at 1359, 158 L. Ed. 2d at 187; see, e.g., Hendricks, 395 F.3d at 179 (holding that "unless a hearsay statement qualifies as 'testimonial,' Crawford is inapplicable and Roberts still controls"); Riner v. Commonwealth, 268 Va. 296, 322-23, 601 S.E.2d 555, 569-70 (2004) (holding decision in Crawford "has no bearing on" admissibility of non-testimonial hearsay).

2. State Hearsay Rules

Hearsay is "[a] statement other than one made by the declarant while testifying at trial--offered in evidence to prove the truth of the matter asserted." Black's Law Dictionary 649 (5th ed. 1979).

> "Whether an extrajudicial statement is hearsay depends upon the purpose for which it is offered and received into evidence. If the statement is received to prove the truth [or falsity] of its content, then it is hearsay and, in order to be admissible, must come within one of the many established exceptions to the general prohibition against admitting hearsay."

Brown v. Commonwealth, 25 Va. App. 171, 177, 487 S.E.2d 248, 251 (1997) (en banc) (citation omitted).

The "state-of-mind" exception is one of these established hearsay exceptions. Clay v. Commonwealth, 33 Va. App. 96, 105-06, 531 S.E.2d 623, 627 (2000) (en banc), aff'd, 262 Va. 253, 546 S.E.2d 728 (2001). If the declarant's state of mind is relevant to the case, then the declarations are admissible under this exception if they meet two additional conditions:

> 1. The statement must refer to a presently existing state of mind. Although the mental state o[r] emotion must exist at the time of the declaration, it may relate to matters occurring in the past or in the future;
>
> 2. There must be no obvious indication of falsification or contrivance[.]

Id. at 105 n.4, 531 S.E.2d at 627 n.4; see also Charles E. Friend, The Law of Evidence in Virginia § 18-18, at 789 (6th ed. 2003).

Despite the apparent inconsistencies in earlier Virginia decisions on the subject, controlling precedent holds that any state of mind of a homicide victim is admissible as long as it is "relevant and probative of some material issue in the case"; its relevance is not limited to rebutting claims of suicide, accident or self-defense. Clay, 262 Va. at 257, 546 S.E.2d at 730. Further, evidence of the communication of the victim's state of mind to the accused is required only when such communication is necessary to establish the relevance of the state of mind. See Clay, 33 Va. App. at 106 n.5, 531 S.E.2d at 627 n.5 (holding communication of victim's state of mind to accused is necessary where evidence is offered to rebut defendant's claim of self-defense but not to rebut defense of accident); see also Hanson v. Commonwealth, 14 Va. App. 173, 188-89, 416 S.E.2d 14, 23 (1987) ("For the state of mind of the victim to be relevant to prove *the state of mind of the accused*, some nexus must exist which inferentially implicates the accused . . . ." (emphasis added)). For example, "a statement made by a declarant is admissible for the purpose of showing the probable state of mind thereby induced in the hearer," such as proving the hearer had "notice . . . or motive, . . . when relevant and material." Johnson v.

Commonwealth, 2 Va. App. 598, 602, 347 S.E.2d 163, 165 (1986) (citing E. Cleary, McCormick on Evidence § 249 (3d ed. 1984)).   Such "statements are not hearsay at all" if "introduced [only] to show the effect that they had on another person, and not to prove that what was said was true." Friend, supra, § 18-18, at 792.  However, if such a statement meets the requirements of the state-of-mind exception, it may be admitted and considered for its truth, as well.

"One of the most common uses of [the state-of-mind] exception is to prove the intention of a person concerning some future act."  Id. at 790-91.  Criminal intent, testamentary intent, and domiciliary intent may be proved with such evidence.  Id. at 791.  A related state-of-mind exception involves evidence of the "declarations of a person of intent to do a future act, *as evidence that this act was in fact later done*."  Id.; see id. at 791 (opining that in "'both civil and criminal [cases], evidence of . . . declarations of intention or design should always be received unless too vague or remote to be of substantial probative value'" (quoting The Law of Evidence in Virginia and West Virginia § 281 (Nash ed. 1954))).

In Karnes v. Commonwealth, 125 Va. 758, 764, 99 S.E. 562, 564 (1919), a murder case, the Virginia Supreme Court adopted the United States Supreme Court's application of the state-of-mind exception in Mutual Life Insurance Co. v. Hillmon, 145 U.S. 285, 12 S. Ct. 909, 36 L. Ed. 706 (1892).  Hillmon involved the admissibility of letters written by a companion of Hillmon's indicating Hillmon and the companion "had the intention of leaving" a particular city on a specific date.  145 U.S. at 294-96, 12 S. Ct. at 912-13, 36 L. Ed. at 710-11.  The Court held as follows in Hillmon:

> The letters in question were competent, not as narratives of facts communicated to the writer by others, nor yet as proof that he actually went away from Wichita, but as evidence that, shortly before the time when other evidence tended to show he went away, he had the intention of going, and of going with Hillmon, which made it more probable both that he did go and that he went with Hillmon, than if there had been no proof of such intention. . . .

> . . . "Such declarations are regarded as verbal acts, and are
> as competent as any other testimony, when relevant to the issue.
> Their truth or falsity is an inquiry for the jury."

Id. at 295-96, 12 S. Ct. at 912-13, 36 L. Ed. at 710 (quoting Ins. Co. v. Mosley, 75 U.S. (8 Wall.) 397, 405, 19 L. Ed. 437, 440 (1869)); see also Friend, supra, § 18-18, at 791 (citing Hillmon as "the leading United States case" on use of state-of-mind hearsay exception "to prove the intention of a person concerning some future act").

Citing its earlier decision in Karnes, the Virginia Supreme Court recently reaffirmed the principle that "statements made by a crime victim that show the victim's state of mind are admissible as an exception to the hearsay rule, provided the statements are relevant and probative of some material issue in the case." Clay, 262 Va. at 257, 546 S.E.2d at 730. Further, we noted in Clay that evidence a homicide victim *feared* the defendant is generally not admitted under the state-of-mind exception but that "'there are undoubtedly a number of possible situations in which such statements may be relevant'" and that "'the courts have developed three rather well defined categories in which the need for such statements overcomes almost any possible prejudice'"--when a defendant "'claim[s] . . . self-defense as justification for the killing'"; contends that the deceased committed suicide; or argues the death was accidental. Clay, 33 Va. App. at 105 & n.3, 531 S.E.2d at 627 & n.3 (quoting United States v. Brown, 490 F.2d 758, 766-67 (D.C. Cir. 1973)); see Clay, 262 Va. at 257-58, 546 S.E.2d at 730 (recognizing that "victim's statements regarding *fear* of the accused are admissible to rebut clams by the defense of self-defense, suicide or accidental death" and not attempting to limit other circumstances under which evidence of victim's fear or any other state of mind will be admissible if relevant and material (emphasis added)); see also Karnes, 125 Va. at 763-67, 99 S.E. at 564-65 (holding evidence of victim's fear of third party was admissible to show someone *other than accused* may have had motive to kill victim).

Thus, per Clay and Karnes, *any* state of mind of a homicide victim is "admissible" as long as it is "relevant and [more] probative [than prejudicial] of *some material issue* in the case," and its relevance is not limited to rebutting claims of suicide, accident or self-defense. Clay, 262 Va. at 257, 546 S.E.2d at 730 (emphasis added); see also Friend, supra, § 18-18, at 793 (citing Clay and Karnes for the principles that "[s]tatements made by a crime victim that show the victim's state of mind are admissible under the state of mind exception if relevant and probative" and that "[a] victim's statements regarding fear of the accused are admissible to rebut claims by the defense of self-defense, suicide, or accidental death"). See generally Friend, supra, § 18-18 (outlining the myriad situations in which state-of-mind evidence is relevant and admissible). As the Court acknowledged in Clay, "[e]vidence is relevant if it tends to prove or disprove, or is pertinent to, matters in issue," and "much must be left to the trial court's discretion." Clay, 262 Va. at 257, 546 S.E.2d at 730.

To the extent our statements in Evans-Smith v. Commonwealth, 5 Va. App. 188, 198-203, 361 S.E.2d 436, 441-44 (1987), and Hanson, 14 Va. App. at 188, 416 S.E.2d at 23, could be construed to suggest that the state of mind of a homicide victim is relevant and material *only* in cases where the defense contends that the death was the result of suicide, accident, or self-defense--a result contrary to the Court's broad statements in Clay-- we conclude these statements were *dicta*.[7] Cf. Clay, 33 Va. App. at 106 n.5, 531 S.E.2d at 627 n.5 (holding a related part of the ruling in Hanson was *dicta*). Thus, Evans-Smith, 5 Va. App. at 198-203, 361 S.E.2d at 441-44, has been limited to hold only that evidence of the victim's *fear* of the accused was inadmissible because (1) the defense did not contend the victim's death was the result of suicide, accident or self-defense and (2) the victim's fear was immaterial to the issues of the

---

[7] To the extent any other panel decisions of this Court rely on the portions of Evans-Smith or Hanson we construe as *dicta*, we conclude the broad statements of the Supreme Court and this Court in Clay implicitly overruled those decisions.

- 13 -

defendant's motive and intent *under the facts of that case*.  Similarly, we limit <u>Hanson</u> to hold

that the victim's state of mind was inadmissible to prove motive *under the facts of that case*

because the evidence failed to support an inference that the victim communicated his state of

mind to the defendant.[8]

Further, to the extent <u>Hanson</u> asserts any state of mind of a homicide victim must have

been communicated to the accused to be admissible, we concluded in <u>Clay</u> that this assertion was

*dicta*.  33 Va. App. at 106 n.5, 531 S.E.2d at 627 n.5.  We explained in <u>Clay</u> that where the state

of mind is the victim's fear of the accused, that state of mind must have been communicated to

the accused when offered to rebut a claim by the accused that he acted in self-defense but that

"the [state-of-mind] exception [for evidence of fear] is not otherwise predicated on proof of such

communication."  <u>Id.</u>  In affirming <u>Clay</u> on appeal, the Supreme Court recited no evidence

---

[8] <u>Hanson</u> held the homicide victim's state of mind was not relevant to prove the
defendant's *motive* because the evidence neither showed the victim communicated his state of
mind to the defendant "nor . . . permi[tted] [the] infer[ence] that he had done so."  14 Va. App. at
188, 416 S.E.2d at 23.  The opinion in <u>Hanson</u> also stated as follows:

> The state of mind of a homicide victim is relevant and
> material only in cases where the defense contends that the death
> was the result of suicide, accident, or self-defense.  <u>Evans-Smith</u>
> [v. Commonwealth], 5 Va. App. [188,] 198, 361 S.E.2d [436,] 442
> [(1987).]  In those instances, the state of mind must have been
> communicated to the accused.  When those defenses are not in
> issue, and when the accused has not been made aware of the
> victim's state of mind, the statement would become relevant only
> through "a circuitous series of inferences."  <u>United States v.</u>
> <u>Brown</u>, 490 F.2d 758, 771 (D.C. Cir. 1973).

<u>Id.</u> (citation and footnote omitted).
However, the decision in <u>Hanson</u> subsequently said the victim's "state of mind *would*
have had significance . . . if the fact finder inferred that [the victim] acted upon his state of mind
by communicating [it] to [the defendant] and that [the defendant] responded by killing [the
victim]."  <u>Id.</u> (emphasis added).  In so holding, the decision in <u>Hanson</u> contradicted its earlier
assertion that a homicide victim's state of mind is relevant *only* where the death was the result of
suicide, accident, or self-defense because the defendant in <u>Hanson</u> made no such claim.  <u>Id.</u> at
179-80, 416 S.E.2d at 17-19 (reciting Hanson's testimony implicating another).

- 14 -

establishing that the victim's fear of the accused had been communicated to the accused. Although the accused had threatened the victim in the presence of others, no evidence established that the accused was aware the victim had told others that she was afraid of him. 262 Va. at 255-58, 546 S.E.2d at 729-30. In deciding Clay, the Court recognized "it is difficult to reconcile the conflicting cases as to when a victim's statements are relevant" but concluded without further qualification that the victim's statements that she feared the accused were admissible to rebut the defendant's claim of accidental death. Id. at 267-68, 546 S.E.2d at 730; see Karnes, 125 Va. at 766-67, 99 S.E. at 565 (citing Virginia cases in which "declarations of the deceased, not made in the presence of the accused," were "admitted as tending to show his guilt" and holding that statements of deceased regarding fear of third party, Agee, not made in Agee's presence, "would have been clearly admissible on behalf of the Commonwealth in the prosecution of Agee for the crime"). The Supreme Court's affirmance constitutes an adoption of this Court's reasoning in Clay.

Thus, despite the apparent inconsistencies in earlier Virginia decisions on the subject, we conclude that *any* state of mind of a homicide victim is admissible as long as it is both "relevant and [more] probative [than prejudicial] of some material issue in the case." Clay, 262 Va. at 257, 546 S.E.2d at 730. Evidence of communication of the victim's state of mind *to the accused* is required *only* when such communication is necessary to establish the relevance of the state of mind. See Clay, 33 Va. App. at 106 n.5, 531 S.E.2d at 627 n.5; Johnson, 2 Va. App. at 602, 347 S.E.2d at 165 (citing E. Cleary, supra, § 249). Evidence of a victim's statements, when offered only to show the effect they had on the accused or some other person, are not hearsay at all. However, if such statements meet the requirements of the state-of-mind exception, they may be considered for their truth, as well.

3.  Application to Hearsay Statements to Farah Canada, Shelly Jones, and Missy Jones

Appellant concedes on appeal that Jackson's challenged statements to Farah Canada, Shelly Jones and Missy Jones were non-testimonial.  Thus, admission of those statements did not violate the Confrontation Clause if those statements "ha[d] adequate indicia of reliability--*i.e.*, [fell] within a 'firmly rooted hearsay exception' or [bore other] 'particularized guarantees of trustworthiness.'"[9]  Crawford, 541 U.S. at 42, 124 S. Ct. at 1359, 158 L. Ed. 2d at 187.  Thus, we must first determine whether Jackson's statements fall under a recognized exception to Virginia's hearsay rule and, if so, whether that exception is "firmly rooted."

a.  Admissibility of Statements Under Virginia Law

(1) Jackson's Statement to Canada on September 1, 2002

Here, just as in Hillmon, the statement victim Shelly Jackson made to Farah Canada the day she disappeared--that Jackson was going to meet appellant and "would be right back"--was relevant to the issue of whether Jackson did, in fact, meet appellant that day.  Evidence establishing that appellant had the opportunity to kill Jackson to prevent her from testifying against him was relevant to the issue of his guilt or innocence.  Cf. Hall v. Commonwealth, 14 Va. App. 65, 69-73, 415 S.E.2d 439, 442-44 (1992) (reciting evidence of motive and opportunity as part of circumstantial evidence supporting conviction).  Here, as in Hillmon, evidence of Jackson's intent to meet appellant was not "proof that [she] actually" met him, but proof of such an intent "made it *more probable* both" that she went to meet him and that she actually succeeded in doing so.  Hillmon, 145 U.S. at 295-96, 12 S. Ct. at 912-13, 36 L. Ed. at 710 (emphasis added).  As the Supreme Court recognized in Karnes,

---

[9] We do not decide what the Confrontation Clause requires with regard to non-testimonial hearsay.  We apply the Roberts test only because the Supreme Court said in Crawford that this is the *most* the Confrontation Clause requires.  Crawford, 541 U.S. at 60-61, 68, 124 S. Ct. at 1369-70, 1374, 158 L. Ed. 2d at 198-99, 203.

> Much must be left to the discretion of the trial judge . . . . [W]hile a single circumstance, standing alone, may appear to be entirely immaterial and irrelevant, it frequently happens that the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion. Where the inquiry is as to the state of one's mind at a particular time, his statements and declarations indicating his state of mind are generally admissible.

125 Va. at 764, 99 S.E. at 564.

The trial court concluded the evidence established Jackson's September 1, 2002 statement to Canada referred to a presently existing state of mind, provided no obvious indication of fabrication or contrivance, and was relevant to the case. We hold the record supports these conclusions.

### (2) Statements to Canada Prior to September 2002

In contrast, we hold the court erred in admitting Canada's testimony about identical statements Jackson made when she dropped her daughter off at Canada's house on numerous occasions prior to September 1, 2002. These statements exhibited Jackson's state of mind at the time she made each previous statement, and no evidence indicated fabrication or contrivance on these prior occasions. Thus, they met the requirements of the state-of-mind exception to the hearsay rule. Nevertheless, controlling case law holds that evidence of where Jackson said she was going on these prior occasions was not relevant to prove where she went on September 1, 2002.[10] As the Supreme Court held in Ligon v. Southside Cardiology Associates, 258 Va. 306, 519 S.E.2d 361 (1999),

> [E]vidence of a person's general habits is not admissible for the purpose of showing the nature of his conduct on a specific occasion. Such evidence of habitual conduct is inadmissible because it consists only of collateral facts, from which no fair

---

[10] The Commonwealth offered these statements only to prove where the victim went on September 1, 2002. Thus, we need not consider whether these statements might have been admissible to prove some other fact in issue.

- 17 -

inferences can be drawn, and tends to mislead the jury and to divert its attention from the issues before the court.

Id. at 311, 519 S.E.2d at 363 (citation omitted). The Court also emphasized that its prior decisions did "not draw a distinction between 'general' and 'specific' habit evidence" and "[i]nstead . . . focus[ed on] . . . whether the proffered evidence is relevant to the issues at trial." Id. Although Ligon was a medical malpractice case in which the issue was the admissibility of evidence that the defendant had acted in a habitually negligent manner, the Supreme Court's language was broad. Further, it interpreted very narrowly an early criminal case, Graham v. Commonwealth, 127 Va. 808, 103 S.E. 565 (1920), in which it had upheld the admission of habit evidence to prove the behavior of a murder victim immediately prior to his murder was in conformity with his behavior on prior occasions. Ligon, 258 Va. at 312 n.1, 519 S.E.2d at 364 n.1. The Court in Ligon interpreted Graham as follows:

Graham, cited by the defendant, is inapposite to the present case. There, we held that since the defendant on trial for murder had asserted a self-defense claim, alleging that the deceased had used violent, profane language and advanced toward him with a gun, the Commonwealth was entitled to introduce rebuttal evidence that the deceased did not have a habit of swearing. 127 Va. at 824, 103 S.E. at 570. We stated that this evidence was admissible under the same principle that allows the admission of character evidence. Id. Thus, our holding in Graham was limited to the use of a narrow category of rebuttal testimony to a claim of self-defense in a criminal prosecution, and is unrelated to the present issue of the admissibility of habit evidence in a negligence action.

Id. (citation omitted).

In 2000, the General Assembly enacted a statute to counteract the 1999 Ligon ruling and permit the admissibility of habit evidence, but that statute expressly applies only to civil proceedings. See Code § 8.01-397.1. Thus, existing Supreme Court precedent authorizes the use of habit evidence in criminal cases only in the narrow circumstances of Graham, as construed in Ligon.

- 18 -

As a result, we conclude the trial court's admission of Jackson's statements to Canada prior to September 1, 2002, about where she was going when she dropped her daughter off at Canada's house were improperly admitted. However, for the reasons discussed, <u>infra</u>, in Part II.E., we hold the erroneous admission of those statements was harmless.

<u>(3) Statement to Shelly Jones on June 23, 2002</u>

The trial court's admission of Jackson's statement to Shelly Jones on June 23, 2002--that Jackson "said she was going to meet [appellant at a particular place] to talk to him about court"--was not error. Although the statement was hearsay, it was admissible for the truth of the matter asserted under the state-of-mind exception. Shelly Jones testified without objection to certain background facts, including that either appellant or his wife, Shanetta, "called [the victim] and said they needed to meet." Jones also testified that she accompanied Jackson to the store and saw her meet with appellant's wife inside a vehicle while appellant paced up and down on a nearby sidewalk. The only aspect of Shelly Jones's testimony to which appellant objected was her indication that the person Jackson said she was going to meet was appellant and that the subject of the intended meeting was "court."

Shelly Jones's testimony about Jackson's statements, like Canada's testimony, referred to Jackson's then-existing state of mind, and the record contains no indication that Jackson had a motive to fabricate. Jones actually accompanied Jackson to the location of the meeting and saw Jackson meet with appellant's wife while appellant waited nearby. Finally, the evidence established that the meeting took place the day before appellant's June 24, 2002 preliminary hearing on the drug charge in which Jackson had implicated him, and appellant himself subsequently introduced a statement purportedly signed by Jackson on June 23, 2002, in which Jackson claimed to have falsely implicated appellant under pressure from police. Thus, appellant's evidence corroborated the fact that Jackson's June 23, 2002 meeting, although with

- 19 -

appellant's wife, was, in fact, "about court." It also was probative of appellant's motive because it showed his concern over whether the victim would testify against him at his preliminary hearing and indicated a likelihood that the victim later communicated to him that she had changed her mind and intended to testify before the grand jury or at a later trial.

### (4) Statement to Missy Jones on August 31, 2002

Finally, Missy Jones's testimony that Jackson said she intended to testify against appellant at trial also was admissible for the truth of its contents under the state-of-mind exception. Jones's testimony established Jackson's statement of future intent and provided no indication that Jackson had a motive to fabricate. Further, the statement was relevant to the issue of appellant's motive for murder because the circumstantial evidence permitted an inference that Jackson communicated this intent to appellant before her death. See Johnson, 2 Va. App. at 602, 347 S.E.2d at 165.

The evidence established that, the day before appellant's preliminary hearing in June 2002, Jackson met with appellant's wife, spoke to appellant's wife about whether she would testify against appellant, and signed a statement--written in someone else's hand and introduced by appellant at trial--in which Jackson claimed her prior incrimination of appellant was false. Although appellant was not in Jackson's immediate presence during this meeting, he was in full view on a nearby sidewalk.

Other evidence established that in the two days (a) after Jackson's attorney advised her on August 30, 2002, that she should agree to testify against appellant and (b) before Jackson disappeared on September 1, 2002, appellant and his wife tried at least twice to reach Jackson and eventually succeeded in setting up a meeting that was to have occurred immediately before Jackson disappeared and in the place where her body was later found. This evidence supported the inference that sometime between when Jackson spoke to her lawyer on August 30, 2002, and

the time she died, she told appellant she had changed her mind and intended to testify against him.

Thus, Jackson's statement to Missy Jones of her intent to testify against appellant--coupled with evidence that appellant and his wife may previously have succeeded in talking appellant out of testifying against appellant, tried repeatedly to reach Jackson in the few days before her death, and eventually succeeded in setting up a meeting between appellant and Jackson that was to have occurred immediately before Jackson disappeared--was probative of appellant's possible motive for killing Jackson.

b.  "Firmly-Rooted" Nature of State-of-Mind Exception

If the state-of-mind exception to the hearsay rule is "firmly rooted" in Virginia's jurisprudence, the admission of Jackson's non-testimonial hearsay statements as related by Farah Canada,[11] Shelly Jones, and Missy Jones did not violate the Confrontation Clause.

"Whether an exception is 'firmly rooted' depends at least in part on how long the exception has been recognized by the legislature or the courts."  Parker v. Commonwealth, 41 Va. App. 643, 653, 587 S.E.2d 749, 754 (2003), overruled in part on other grounds by Crawford, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177.  The exception permitting the admission of relevant and material hearsay statements of a crime victim showing the victim's state of mind has been a part of Virginia jurisprudence since at least the Virginia Supreme Court's decision in Karnes, 125 Va. 758, 99 S.E. 562, cited with approval in Clay, 262 Va. at 257, 546 S.E.2d at 730.  Although Karnes involved statements of the victim that a third party had threatened her and

_____

[11] As discussed, supra, in Section II.A.3.a.(2), Canada's testimony about Jackson's statements prior to September 1, 2002, were not excluded on hearsay grounds.  Although hearsay, they met the requirements of the state-of-mind exception to Virginia's hearsay rule.  The error in their admission was due to a lack of relevance.  Thus, we examine whether their admission violated the Confrontation Clause under the same test we apply to the other challenged evidence.

that she was afraid of him, the Court relied on the United States Supreme Court's decision in Hillmon, which, as discussed above, involved facts very similar to those at issue in appellant's case--use of the state-of-mind exception to prove the victim's intent to do a future act. Karnes, 125 Va. at 763-65, 99 S.E. at 564; see Hillmon, 145 U.S. at 294-96, 12 S. Ct. at 912-13, 36 L. Ed. at 710-11; see also United Constr. Workers v. Laburnum Constr. Corp., 194 Va. 872, 896, 75 S.E.2d 694, 709 (1953) (citing, *inter alia*, Karnes for proposition that "[i]t is well established that evidence of such utterances is admissible to show the state of mind of the declarants"). See generally Hayes v. York, 311 F.3d 321, 325 (4th Cir. 2002) ("[T]he Supreme Court never has questioned that a state-of-mind hearsay exception is one of the firmly-rooted hearsay exceptions. The history of the . . . exception is long and distinguished, and the exception exists in every jurisdiction in the country, whether by statute, court rule, or common law tradition." (citations omitted)).

Thus, since at least 1919, the Virginia Supreme Court has recognized a state-of-mind exception permitting proof of a statement of intent to do a future act. Because Jackson's non-testimonial statements to Canada, Shelly Jones, and Missy Jones were admissible under a "firmly-rooted" exception to Virginia's hearsay rule, their admission did not violate the Confrontation Clause.

4. Jackson's Written Confession to Police

Jackson's written confession to police implicating appellant was testimonial under the Confrontation Clause and was made at a time when appellant had no opportunity for cross-examination. Crawford, 541 U.S. at 68, 124 S. Ct. at 1374, 158 L. Ed. 2d at 203. Thus, if the statement was offered to prove the truth of any of its contents vis-à-vis appellant, appellant was entitled, upon proper contemporaneous objection, to prevent admission of the offending portion of the confession unless the declarant was available for cross-examination at trial. Id. at

59 n.9, 68, 124 S. Ct. at 1369 n.9, 1374, 158 L. Ed. 2d at 197 n.9, 203.  When appellant moved prior to trial to exclude the statement, the trial court ruled Jackson's written confession implicating appellant was admissible to show appellant's motive for wanting to kill Jackson but was not admissible to show appellant distributed drugs or conspired with Jackson to do so, or for the truth of any of the rest of its contents vis-à-vis appellant.

As set out above, "[t]he [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."  Id. at 59 n.9, 124 S. Ct. at 1369 n.9, 158 L. Ed. 2d at 197 n.9 (citing Street, 471 U.S. at 414, 105 S. Ct. at 2081-82, 85 L. Ed. 2d at 431).  Although the Commonwealth is not required to prove a defendant's motive for committing a crime, evidence of motive is relevant to proving one's guilt of a particular crime.  See, e.g., Wilson v. Commonwealth, 16 Va. App. 213, 220, 429 S.E.2d 229, 234, aff'd, 17 Va. App. 248, 436 S.E.2d 193 (1993) (en banc).  Here, the Commonwealth offered evidence that Jackson had implicated appellant in a marijuana distribution conspiracy in order to show he had a motive for killing her, not to show that he had in fact engaged in such a conspiracy.  See Dednam v. State, ___ S.W.2d ___, ___ (Ark. 2005) (upholding admission of victim's testimonial statement implicating one Baker in uncharged crime, robbery of victim, for purpose of proving motive of defendant, Baker's cousin, to commit charged crime, killing of victim).  Thus, the court's pretrial ruling that Jackson's statement was admissible to prove motive was not erroneous.

Appellant now contends that admission of the entire statement was error because it contained references to his possessing a gun and other things that were not directly relevant to motive.  Because appellant did not request that Jackson's confession be redacted or summarized, the trial court's admission of the statement in its entirety was not erroneous.  See Rule 5A:18; see also Street, 471 U.S. at 416, 105 S. Ct. at 2082-83, 85 L. Ed. 2d at 432 (noting that although

prosecutor could have used summary of unindicted co-conspirator's confession in rebuttal without actually "reading [the full] confession," "such a rebuttal presentation was not the only option constitutionally open"). Further, "[w]hen evidence that might otherwise be hearsay is admitted for a limited, non-hearsay purpose [and] the trial court . . . instruct[s] the jury that they are to consider the evidence for the specific limited purpose . . . , we presume that the jury followed that instruction." Hanson, 14 Va. App. at 187, 416 S.E.2d at 22 (citing LeVasseur v. Commonwealth, 225 Va. 564, 589, 304 S.E.2d 644, 657 (1983)). Here, appellant raised the issue of a limiting instruction prior to trial, and the court told appellant it would consider such an instruction if appellant proffered it at trial. However, the record indicates appellant never proffered such an instruction at trial. Thus, appellant waived his right to have the jury instructed that it could consider the confession only as it related to appellant's motive. See, e.g., Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998) ("Rule 5A:18 applies to bar even constitutional claims.").

The facts here are distinguishable from those in Donahue v. Commonwealth, 225 Va. 145, 300 S.E.2d 768 (1983), relied on by appellant. In Donahue, the defendant objected to the admission of certain evidence, claiming it was hearsay, and the court accepted the Commonwealth's representation that it was not offering the evidence to prove the truth of its contents. Id. at 151, 300 S.E.2d at 771. Thereafter, however, the Commonwealth relied heavily on the truth of the statement's contents. Id. at 151-52, 300 S.E.2d at 771-72. The Supreme Court ruled that the defendant's failure to register an additional hearsay objection to admission of the evidence did not amount to a waiver of that objection and that the Commonwealth's use of the statement for its truth was reversible error because it did not fall under any hearsay exception and its admission was not harmless. Id.

Here, based on the Supreme Court's reasoning in Donahue, we conclude the prosecutor remained bound by the court's pretrial ruling that Jackson's confession was admissible only to prove appellant's motive and not for the truth of Jackson's statements that appellant conspired with her to distribute marijuana, gave her a gun, and told her to lie to police about what was taken in the burglary of her home. However, we hold no reversible error occurred under Donahue because the prosecutor's comments in closing argument did not violate the court's pretrial ruling. As discussed above, Jackson's non-testimonial hearsay statements to Farah Canada and Shelly and Missy Jones, properly admitted for the truth of their contents under a firmly-rooted exception to Virginia's hearsay rule, were "statements made by the deceased" or "from the grave" to which the prosecutor properly could refer in closing argument. Thus, these comments did not compel the conclusion that the prosecution made impermissible references to Jackson's confession. Similarly, the prosecutor's reference in closing argument to Jackson's confession to police as "a very damning thing" may fairly be construed only as an argument that it showed appellant had a strong motive for wanting to kill Jackson, a use of the statement permitted under the Confrontation Clause and the Commonwealth's hearsay rules. Further, when the prosecutor spoke of Lt. Lovelace's intentions regarding Jackson's confession, the prosecutor argued specifically that Lovelace "wanted [Jackson] . . . to testify against [appellant] because *she had identified him* as her supplier." (Emphasis added). The prosecutor expressly did not argue that appellant was, in fact, Jackson's supplier, only that Jackson had *identified him* as her supplier. The fact of identification established a motive regardless of the truth or falsity of the identification. See Street, 471 U.S. at 411, 414, 105 S. Ct. at 2080, 2081, 85 L. Ed. 2d at 429, 430 (holding that unindicted co-conspirator's out-of-court confession would have been hearsay only if "jury had been asked to infer that [co-conspirator's] confession proved that defendant participated in the murder" and was admissible to rebut defendant's claim that his own

- 25 -

confession resulted when sheriff "read from [co-conspirator's] statement and directed [defendant] to say the same thing"). Finally, Lt. Lovelace had testified without objection that, during the course of his investigation, before Jackson made the written confession, Lovelace was "getting information in from other people" that Jackson was distributing marijuana and that appellant was her supplier. Thus, other properly admitted evidence implied appellant was a drug dealer and would have permitted the prosecutor to refer to that connection without relying on Jackson's confession.

For similar reasons, the admission of Jackson's confession did not violate Virginia's hearsay rule. Excluded from the hearsay rule are statements not offered for the truth of their content. See, e.g., Church v. Commonwealth, 230 Va. 208, 211, 335 S.E.2d 823, 825 (1985).

> Part of the difficulty in "not-for-truth" situations is due to the fact that often such evidence will have a dual nature; the declaration may indeed be relevant on some matter unrelated to the truth of the content of the statement, and yet the content of the statement may go to the issues of the case as well. See, e.g., Donahue v. Commonwealth, [225 Va. 145, 300 S.E.2d 768 (1983)]. This is perhaps the situation which creates the greatest dilemma for the courts. In that regard, however, it should be remembered that it is a time-honored principle of evidence law that, in general, if evidence is admissible for *any* purpose, it is admissible.

Brown, 25 Va. App. at 177-78, 487 S.E.2d at 251 (quoting 2 Charles E. Friend, The Law of Evidence in Virginia § 18-3, at 95-96 (4th ed. 1993) (footnote omitted)) (other citation omitted).

Here, the trial court ruled the statements were not offered for their truth; appellant never proffered a limiting instruction; and the prosecutor did not expressly argue to the jury the contents of Jackson's confession vis-à-vis appellant as if they were true.

Further, the record supported a finding that the probative value of Jackson's confession and her implication of appellant was greater than any prejudice that might have resulted. As a general rule, "[e]vidence tending to show commission of other offenses is not admissible in a criminal trial if its only relevance is to show the character of the accused or his disposition to

- 26 -

commit a similar offense." Essex v. Commonwealth, 18 Va. App. 168, 171, 442 S.E.2d 707, 709 (1994). However, if "evidence of another crime tends to prove 'any other relevant fact of the offense charged, and is otherwise admissible, it will not be excluded merely because it also shows [the defendant] to have been guilty of another crime.'" Id. (quoting Pugliese v. Commonwealth, 16 Va. App. 82, 91, 428 S.E.2d 16, 23 (1993)); see Farmer v. Commonwealth, 10 Va. App. 175, 179, 390 S.E.2d 775, 776-77 (1990), aff'd en banc, 12 Va. App. 337, 404 S.E.2d 371 (1991). An accused is not entitled "to have the evidence 'sanitized' so as to deny the jury knowledge of all but the immediate crime for which he is on trial." Scott v. Commonwealth, 228 Va. 519, 526-27, 323 S.E.2d 572, 577 (1984). "In addressing the admissibility of other crimes evidence the court must balance the probative value of the evidence of the other offenses and determine whether it exceeds the prejudice to the accused. The court's weighing of these factors is reviewable only for clear abuse of discretion." Pavlick v. Commonwealth, 27 Va. App. 219, 226, 497 S.E.2d 920, 924 (1998) (en banc) (citations omitted).

"When evidence that might otherwise be hearsay is admitted for a limited, non-hearsay purpose [and] the trial court . . . instruct[s] the jury that they are to consider the evidence for the specific limited purpose . . . , we presume that the jury followed that instruction." Hanson, 14 Va. App. at 187, 416 S.E.2d at 22. Here, because appellant requested but failed to proffer a limiting instruction--whether due to oversight or trial strategy--and because the Commonwealth did not rely on the evidence for an improper purpose, appellant may not now complain about the trial court's failure to give a limiting instruction or the possibility that the jury may have considered Jackson's confession for the truth of its allegation that appellant was a drug dealer. When hearsay evidence is admitted in a jury trial without a limiting instruction, the finder of fact may consider it for any purpose. Cf. Stevens v. Mirakian, 177 Va. 123, 131, 12 S.E.2d 780, 783 (1941) (holding "hearsay testimony admitted without objection may properly be considered and

given its natural probative effect" by the finder of fact), <u>cited with approval in</u> <u>Baughan v. Commonwealth</u>, 206 Va. 28, 31, 141 S.E.2d 750, 753 (1965); <u>Crawley v. Commonwealth</u>, 29 Va. App. 372, 376, 512 S.E.2d 169, 171 (1999) (holding hearsay evidence admitted without objection is part of record for purposes of appeal).

B.

OUT-OF-COURT AND IN-COURT IDENTIFICATIONS

A defendant seeking to suppress an out-of-court identification resulting from a photographic lineup bears a weighty burden of establishing both (1) that the procedure was impermissibly suggestive and (2) that this flaw created a substantial likelihood of irreparable misidentification. <u>Simmons v. United States</u>, 390 U.S. 377, 384, 88 S. Ct. 967, 971, 19 L. Ed. 2d 1247, 1253 (1968). Thus, an out-of-court identification resulting from an impermissibly suggestive lineup does not violate due process and may nevertheless be admissible if it was "not so unreliable as to create a substantial likelihood of misidentification." <u>Neil v. Biggers</u>, 409 U.S. 188, 197-98, 93 S. Ct. 375, 381-82, 34 L. Ed. 2d 401, 410-11 (1972). If the lineup was impermissibly suggestive, the identification may nevertheless be reliable and admissible if certain additional conditions are met. <u>Id.</u> at 199-200, 93 S. Ct. at 382-83, 34 L. Ed. 2d at 411; <u>see also</u> <u>Manson v. Brathwaite</u>, 432 U.S. 98, 114, 97 S. Ct. 2243, 2253, 53 L.Ed.2d 140, 154 (1977). Where the admission of identification evidence does not give rise to a very substantial likelihood of irreparable misidentification, the evidence is admissible and the weight to be attributed to it is for the jury to decide. <u>Bryant v. Commonwealth</u>, 10 Va. App. 421, 427, 393 S.E.2d 216, 220 (1990). Finally, even if an out-of-court identification cannot be admitted under this test, an in-court identification may still be admissible "if the origin of that identification is independent of the inadmissible out-of-court identification procedure." <u>Hill v. Commonwealth</u>,

- 28 -

2 Va. App. 683, 693, 347 S.E.2d 913, 918 (1986), quoted with approval in Charity v.

Commonwealth, 24 Va. App. 258, 261, 482 S.E.2d 59, 60 (1997) (en banc).

1. Out-of-Court Identification

In determining whether a photographic lineup was impermissibly suggestive under part

(1) of the above test, a court should look to both the photographs themselves and the manner in

which they were presented to the identifying witness. See State v. Boykins, 320 S.E.2d 134, 138

(W. Va. 1984). A valid lineup does not require that all the suspects or participants be alike in

appearance and have the same description as long as nothing singles the accused out from the

rest. Williamson v. Commonwealth, 211 Va. 57, 59, 175 S.E.2d 285, 287 (1970). Where police

indicate to the witness prior to the witness' viewing the photographs that they have evidence that

one of the people in the lineup committed the crime, the chance of misidentification is

heightened. Bryant, 10 Va. App. at 425-26, 393 S.E.2d at 219 (citing Simmons, 390 U.S. at 383,

88 S. Ct. at 971, 19 L. Ed. 2d at 1253).

In appellant's case, the evidence supported the trial court's ruling that the sequential

photographic lineup presented to Al-Rammal on Wednesday, September 4, 2002, was not unduly

suggestive. The array contained five very similar photographs. All were head shots of young

males of the same race with similar hairstyles. Although one of the photographs was a "mug

shot" taken against a backdrop including a height scale, the remaining four photographs,

including the photograph of appellant, were taken against neutral backgrounds and gave no

indication of the individual's height or custodial status.

The record supported a finding that the manner in which the lineup was presented to

Al-Rammal also was not unduly suggestive. The evidence, viewed in the light most favorable to

the Commonwealth, established that, prior to showing Al-Rammal the photographs, the

investigators said merely that they would like Al-Rammal to look at some photographs and tell

them whether he had seen any of the people in the photographs in the Chevron station's convenience store in the preceding two to four days.[12] Investigator Clay testified that he did not indicate to Al-Rammal that he wanted Al-Rammal to choose any particular photo. Further, Investigator Clay made no representation that any of the individuals depicted in the photographs had, in fact, been in the store during that period of time. Cf. Charity, 24 Va. App. at 262, 482 S.E.2d at 61 (noting as factor supporting finding of lack of suggestiveness that police "told [witness] she needed to see the video lineup [but] . . . did not tell her it would include the perpetrator").

Appellant claims the out-of-court photo identification of September 4, 2002 was unduly suggestive but does not articulate precisely how he contends it was suggestive. He states in his recitation of the facts that the investigators were "interested in a black male with dreadlocks" and that this interest somehow tainted Al-Rammal's identification of appellant's picture. Had the investigators told Al-Rammal they were looking for a young black male with dreadlocks and then showed him a photo array in which only one black male with dreadlocks appeared, no doubt exists that the lineup would have been unduly suggestive. However, the evidence, as found by the trial court, was that all photos in the array were head shots of relatively young black males

---

[12] Appellant makes much of the fact that one of the investigators could not remember and did not take detailed notes about precisely what he told Al-Rammal prior to showing him the photo lineup, such as whether he described appellant's size and build and whether he mentioned the person they were seeking was a murder suspect. The evidence, viewed in the light most favorable to the Commonwealth and as found by the trial court, was that "Al-Rammal himself . . . indicated that the only thing they did was ask him to look at the photographs and tell them whether or not [he] had seen this person during the last couple days." Thus, the investigator's poor memory does not compel the conclusion appellant advances. Cf. Sanchez v. Commonwealth, 41 Va. App. 340, 354-55, 585 S.E.2d 337, 344 (2003) (noting evidence was "uncontradicted" that witness did not hear or remember comments claimed to be suggestive and that "[l]ogic dictates that no suggestive effect can flow from a statement that was not heard or remembered").

with dreadlocks, and four of the five photos, including appellant's, had been taken against neutral backgrounds providing no indication of the subject's height or custodial status.

Appellant's argument, in essence, is that where no crime or other event has occurred causing a potential witness to focus on a particular person, no method exists that is not unduly suggestive by which police can seek to determine whether the witness might have encountered that person in a particular place or at a particular time. This simply is not the law. We cannot conceive of any lineup procedure that would have been significantly less suggestive than the one the investigators utilized on September 4, 2002, while still calculated to yield useable information. Appellant's argument, in essence, is that Al-Rammal's credibility was suspect and, thus, that the identification was unreliable. Because the sequential photo lineup employed by the police was not unduly suggestive, Al-Rammal's out-of-court identification of appellant as having been in the convenience store on a relevant date at a relevant time was admissible. Simmons, 390 U.S. at 384, 88 S. Ct. at 971, 19 L. Ed. 2d at 1253. Appellant's arguments about Al-Rammal's credibility were appropriately left to the jury. See Bryant, 10 Va. App. at 427, 393 S.E.2d at 220.

2. In-Court Identification

Because the September 4, 2002 out-of-court identification was not unduly suggestive, it could not have irreparably tainted Al-Rammal's subsequent in-court identification of appellant, and thus, we need not consider whether the in-court identification was sufficiently independent of the original identification. However, appellant also contends the in-court identification was irreparably tainted by the identification Al-Rammal made for the prosecutor the week before the July 1, 2003 motion hearing. On that occasion, the prosecutor appeared at the Reidsville Chevron station with the same photos Al-Rammal had viewed on September 4, 2002, and told Al-Rammal which photo he had identified on that prior occasion.

Assuming without deciding these events were unduly suggestive and could have created a substantial likelihood of irreparable misidentification, the evidence supported a finding that the in-court identification was based upon the witness' observation of the accused at the convenience store, independent of the lineup, rendering the in-court identification admissible. Hill, 2 Va. App. at 693, 347 S.E.2d at 918. Al-Rammal testified that the prosecutor asked him if he could identify again the person he had previously identified, to which Al-Rammal responded he would do his best and picked out a picture. The record did not establish whether the prosecutor told Al-Rammal which picture he had identified on September 4, 2002 before or after Al-Rammal selected a photo in late June 2003. Also, the record did not establish which photo Al-Rammal selected. Finally, and most importantly, Al-Rammal testified that he had an independent recollection both of the person he saw in the store on September 1, 2002, and the five photographs he viewed on September 4, 2002, as part of the sequential photo lineup. He testified without equivocation that his recollection of the appearance of the person he had seen in the Chevron station store on September 1, 2002, was not affected by the prosecutor's having shown him the photograph of appellant in late June 2003. See McCary v. Commonwealth, 228 Va. 219, 232-34, 321 S.E.2d 637, 644-45 (1984) (upholding admission of in-court identifications even though witnesses were originally unable to identify accused in photo lineup and were subsequently told by police that he was the perpetrator because in-court identifications "had independent sources free from taint, specifically the ample opportunities the victims availed themselves of to observe McCary in his activities before and during the crime"). Because the evidence supported a finding that Al-Rammal's in-court identification of appellant was not tainted by the June 2003 out-of-court identification, the trial court did not err by permitting the in-court identification and allowing the jury to evaluate what weight to give that identification. See id.

C.

MISTRIAL MOTIONS

The denial of a motion for a mistrial will not be reversed absent an abuse of discretion.

Beavers v. Commonwealth, 245 Va. 268, 280, 427 S.E.2d 411, 420 (1993). "The rule in

Virginia is well established that a judgment will not be reversed for the admission of evidence

. . . which the court afterwards directs the jury to disregard unless there is a manifest probability

that the evidence or statement has been prejudicial to the adverse party." Saunders v.

Commonwealth, 218 Va. 294, 303, 237 S.E.2d 150, 156 (1977). "[A]s an exception to the

[general] rule, if the prejudicial effect of the impropriety cannot be removed by the instructions

of the trial court, the defendant is entitled to a new trial." Kitze v. Commonwealth, 246 Va. 283,

288, 435 S.E.2d 583, 585 (1993). "When counsel deliberately places irrelevant issues before a

jury for an improper purpose, the likely necessity of granting a mistrial increases." Lowe v.

Cunningham, 268 Va. 268, 274, 601 S.E.2d 628, 631 (2004).

> Whether improper evidence is so prejudicial as to require a mistrial
> is a question of fact to be resolved by the trial court in each
> particular case. Unless this Court can say that the trial court's
> resolution of that question was wrong as a matter of law, it will not
> disturb the trial court's decision on appeal.

Beavers, 245 Va. at 280, 427 S.E.2d at 420.

Appellant contends Farah Canada's testimony that she had previously seen appellant with

a gun was highly prejudicial and that this prejudice could not be removed with a curative

instruction. We disagree.[13]

Canada, in her brief testimony on the subject, gave no indication as to when she had seen

appellant with a gun. When the trial court instructed the jury to disregard Canada's testimony, it

---

[13] We do not revisit the issue of whether the trial court erred in excluding the evidence without allowing the Commonwealth to proffer through the witness additional information such as when she had seen appellant with a firearm.

- 33 -

included the explanation that it "finds the evidence is so remote as not to be relevant to the issues in this case." Finally, the Commonwealth had already introduced uncontradicted evidence that police found a half-full box of 9 millimeter ammunition beneath appellant's bed when they had searched his house on March 29, 2002, pursuant to a warrant. Thus, the evidence supports the trial court's implicit finding that there was no manifest probability that Canada's testimony was so prejudicial that the prejudice could not be cured with a cautionary instruction. Compare Kitze, 246 Va. at 289, 435 S.E.2d at 586 (holding cautionary instruction insufficient to remove prejudice where prosecutor "improperly told the jury that if it found that Kitze had committed the offenses because of an irresistible impulse, then he would be set free, and he implied that the jurors, as protectors of the community, would have failed in their responsibility to protect the community").

Appellant also claims he was entitled to a mistrial when the Commonwealth offered into evidence a letter the trial court had already ruled was inadmissible. Appellant contends the prosecution intentionally offered the letter into evidence in contravention of the trial court's prior ruling in order "to force the defense to object in front of the jury," which appellant contended was prejudicial. However, the trial court found "that it was not inappropriate for the Commonwealth to ask for [the letter's] admission and have the Court rule on it" and that the occurrence did not provide grounds for a mistrial. We hold the record supports this finding.

Prior to trial, the court instructed the jury:

> The admission of evidence is governed by rules of law. From time
> to time it may be the duty of the attorneys to make objections.
> And it would be my duty as judge to rule on those objections and
> to determine whether you can consider certain evidence. You must
> not consider testimony or exhibits to which an objection was
> sustained or which has been ordered stricken.

At trial, the court ruled outside the presence of the jury that the Commonwealth would be allowed to show the letter to the testifying witness but that neither the letter itself nor its contents

- 34 -

would be admitted into evidence. In the wake of this ruling, the Commonwealth expressed some confusion over how to handle the letter before the jury. The prosecutor indicated outside the presence of the jury that he would at least offer the letter into evidence, and appellant did not object. Thus, the record supports the court's express finding that it was not inappropriate for the Commonwealth to move the letter's admission in order to obtain a formal ruling and its implicit finding that these events did not present a manifest probability of prejudice sufficient to deprive appellant of a fair trial.

Finally, this same analysis supports the trial court's denial of appellant's similar post-trial motions. Although appellant points on brief to "[o]ther conduct by the prosecution" that he contends was "inconsistent with notions of fairness," nothing in the record indicates appellant brought to the attention of the trial court his position that these actions supported his request for a mistrial. See Rule 5A:18. He may not raise them for the first time on appeal.

D.

SUFFICIENCY OF THE EVIDENCE

When considering the sufficiency of the evidence on appeal in a criminal case, we view the evidence in the light most favorable to the Commonwealth, granting to the evidence all reasonable inferences fairly deducible therefrom. Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). The credibility of a witness, the weight accorded the testimony, and the inferences to be drawn from proved facts are matters to be determined by the fact finder. Long v. Commonwealth, 8 Va. App. 194, 199, 379 S.E.2d 473, 476 (1989). The judgment will not be set aside unless it is plainly wrong or without supporting evidence. Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987).

"Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except

- 35 -

that of guilt." Coleman v. Commonwealth, 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983). However, "the Commonwealth need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant." Hamilton v. Commonwealth, 16 Va. App. 751, 755, 433 S.E.2d 27, 29 (1993). "Whether an alternative hypothesis of innocence is reasonable is a question of fact and, therefore, is binding on appeal unless plainly wrong." Archer v. Commonwealth, 26 Va. App. 1, 12-13, 492 S.E.2d 826, 832 (1997) (citation omitted).

"Where the evidence is entirely circumstantial, . . . [t]he chain of necessary circumstances must be unbroken. The circumstances of motive, time, place, means and conduct must all concur to form an unbroken chain which links the defendant to the crime beyond a reasonable doubt." Bishop v. Commonwealth, 227 Va. 164, 169, 313 S.E.2d 390, 393 (1984). However, "not all of the listed circumstances must be proved in every case." Cantrell v. Commonwealth, 229 Va. 387, 398, 329 S.E.2d 22, 29 (1985). Rather, "those circumstances which *are* proved must each be consistent with guilt and inconsistent with innocence, and . . . they must also be consistent with each other, that is to say, they must *concur* in pointing to the defendant as the perpetrator beyond a reasonable doubt." Id. "While no single piece of evidence may be sufficient, the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.'" Stamper v. Commonwealth, 220 Va. 260, 273, 257 S.E.2d 808, 818 (1979) (quoting Karnes, 125 Va. at 764, 99 S.E. at 564).

Here, the circumstantial evidence, viewed in the light most favorable to the Commonwealth, proved beyond a reasonable doubt that appellant was criminally responsible for Jackson's murder, either as the trigger man or as a principal in the second degree by aiding and abetting the murder. See, e.g., Code § 18.2-18 ("In the case of every felony, every principal in

the second degree . . . may be indicted, tried, convicted and punished in all respects as if a principal in the first degree . . . .").

Appellant had a powerful motive for wanting Jackson dead. In her confession to police, which the prosecution did not use to prove the truth of its contents, Jackson had implicated appellant in a marijuana distribution conspiracy, and police wanted Jackson to testify against appellant on related charges. Police had also gathered other evidence implicating appellant in marijuana distribution, the admission of which was not challenged by appellant.

The day before appellant's preliminary hearing in June 2002, Jackson said she had to meet appellant at a particular location to talk "about court." Jackson then went to that location, where appellant's wife succeeded in talking Jackson out of testifying against appellant and had her sign a statement saying her earlier confession implicating appellant was false. Appellant was not in the immediate presence of Jackson and appellant's wife during that encounter, but he paced on a nearby sidewalk. Jackson refused to testify at appellant's preliminary hearing, and the charges against appellant were dismissed.

By August 2002, however, the Commonwealth's Attorney's office was planning to directly indict appellant on the charges previously dismissed at his preliminary hearing and again sought to have Jackson testify against him. The Commonwealth's Attorney told Jackson's lawyer how he planned to proceed against Jackson if she persisted in her refusal to testify against appellant. On Friday, August 30, 2002, Jackson's attorney advised Jackson that she should testify against appellant, and on the evening of Saturday, August 31, 2002, Jackson told her cousin, Missy Jones, she planned to do so.

The only reasonable inference flowing from the evidence, viewed in the light most favorable to the Commonwealth, is that appellant also learned of Jackson's intent to testify, giving him a motive for wanting her dead. Appellant's wife tried to reach Jackson by telephone

the evening of Friday, August 30, 2002, but Jackson was not at home. On Sunday, September 1, 2002, appellant himself phoned Jackson at the residence she shared with her sister. Jackson immediately dressed her two-year-old daughter and drove her to the home of her friend and babysitter, Farah Canada, where she arrived at about 12:00 noon. Jackson told Canada she was going to meet appellant "down the dirt road past [appellant's] house" and that "she would be right back," but Jackson never returned.

Jackson's body was subsequently found on property owned by appellant's father, in the location where Jackson had told Canada she was going to meet appellant. Jackson had been shot, and within an eight-foot radius of her body, police found fresh shell casings of the same type police had recovered from beneath appellant's bed in a search of his home in March 2002. Evidence at the scene indicated Jackson had been dragged through the underbrush from another location a short distance away to the spot where her body was found. In the original location, police found an earring Jackson had been wearing when she left home shortly before she disappeared, as well as a spot of her blood and a pocketknife. The forensic evidence, viewed in the light most favorable to the Commonwealth, established that it was "[b]illions of times more likely" that appellant was one of the contributors to the DNA on the knife grip as opposed to some unknown individual.

When police conducted an additional search of the area several days later, they located a large hole they referred to as "a make-shift grave," about 150 feet from where Jackson's body had been found. The hole itself was eleven inches deep and contained "a small amount" of "standing water." Rainfall records admitted at trial established that two inches of rain fell between 7:00 a.m. on Saturday, August 31, and 7:00 a.m. on Sunday, September 1, 2002. However, between 7:00 a.m. on Sunday, September 1, and the time police found the hole, the

area had only a negligible amount of rain, permitting the inference that the hole had been dug no later than 7:00 a.m. on September 1, 2002, *prior to* Jackson's death.

Appellant's cellular telephone records showed that, beginning at 12:40 p.m. on Sunday, September 1, 2002, appellant began to make a series of telephone calls first to his home and then to his wife's cellular telephone. The "switches" accessed during those telephone calls indicated that appellant traveled southward past the Danville, Virginia switch and into North Carolina, where he made several calls that accessed the Reidsville, North Carolina switch between 1:57 and 2:14 p.m. Appellant admitted to police that he kept his cellular telephone in his possession at all times excepting those periods during which he was recharging it. Appellant's wife's cellular telephone records show that her telephone also traveled south during that period of time.

Finally, appellant was seen at a particular Reidsville convenience store between 2:00 and 4:00 p.m. that afternoon, and Jackson's car was found abandoned in the adjacent parking lot of a hotel later that evening. The place where Jackson's car was found was about 58 miles from the crime scene and took police about one hour seven minutes to reach by car.

The only reasonable hypothesis flowing from this evidence, viewed in the light most favorable to the Commonwealth, is that appellant learned Jackson planned to testify against him; killed her to prevent her from doing so; drove her car to Reidsville, North Carolina, where he abandoned it; and met his wife or someone else using her cellular telephone, with whom he drove back to Virginia. Appellant's hypothesis that the father of Jackson's unborn baby could have killed her does not flow from the evidence, as the testimony established that police interviewed him on at least two occasions and did not consider him a suspect. Appellant, by contrast, had motive, opportunity, and means, and the circumstantial evidence "point[ed] to [him] as the perpetrator beyond a reasonable doubt." Cantrell, 229 Va. at 398, 329 S.E.2d at 29.

E.

HARMLESS ERROR

As discussed, supra, in Part II.A.3.a.(2), the trial court's admission of Jackson's statements about where she went to meet appellant on numerous prior occasions was error because this evidence was not relevant to prove where she went on September 1, 2002. Nevertheless, the erroneous admission of this evidence does not require reversal if the error was harmless. We conclude the error was harmless.

> In Virginia, non-constitutional error is harmless "[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached." Code § 8.01-678 (emphasis added). "[A] fair trial on the merits and substantial justice" are not achieved if an error at trial has affected the verdict. Consequently, under Code § 8.01-678, a criminal conviction must be reversed unless "it plainly appears from the record and the evidence given at the trial that" the error did not affect the verdict. An error does not affect a verdict if a reviewing court can conclude, without usurping the jury's fact finding function, that, had the error not occurred, the verdict would have been the same.

Lavinder v. Commonwealth, 12 Va. App. 1003, 1005, 407 S.E.2d 910, 911 (1991) (en banc). See generally Clay, 262 Va. at 260, 546 S.E.2d at 732 (adopting federal standard for determining whether non-constitutional error is harmless, including provision that verdict should stand if it "'did not influence the jury[] or had but slight effect'" (quoting Kotteakos v. United States, 328 U.S. 750, 764-65, 66 S. Ct. 1239, 1248, 90 L. Ed. 1557, 1566-67 (1946)).

An error is harmless if "other evidence of guilt is 'so overwhelming and the error so insignificant by comparison that the error could not have affected the verdict,'" or, "even if the evidence of the defendant's guilt is not overwhelming, if the evidence admitted in error was merely cumulative of other, undisputed evidence." Ferguson v. Commonwealth, 16 Va. App. 9, 12, 427 S.E.2d 442, 444-45 (1993) (quoting Hooker v. Commonwealth, 14 Va. App. 454, 458 n.2, 418 S.E.2d 343, 345 n.2 (1992)).

- 40 -

Here, both theories establish the harmlessness of the error in appellant's case.  First, Jackson's erroneously admitted statements about where she was going to meet appellant on occasions prior to September 1, 2002, to the extent they may have been considered by the jury, were less probative of the facts at issue in the case than other properly admitted evidence-- Jackson's statement about where she was going to meet appellant on the date at issue, September 1, 2002, immediately prior to her disappearance.  Thus, to the extent the jury may have considered the irrelevant evidence as probative, it was "merely cumulative of other, undisputed evidence."  Id.

Second, we conclude the error was harmless because, as discussed in detail, supra, in Part II.D., "other evidence of guilt [was] 'so overwhelming and the error so insignificant by comparison that the error could not have affected the verdict.'"  Ferguson, 16 Va. App. at 12, 427 S.E.2d at 444-45 (quoting Hooker, 14 Va. App. at 458 n.2, 418 S.E.2d at 345 n.2).

Further, the Supreme Court's holding in Ligon, discussed in more detail, supra, in Part II.A.3.a.(2), does not support a contrary result.  In Ligon, a civil case, the record contained no evidence of the defendant doctor's conduct on the occasion at issue, and the doctor himself had no independent recollection of the patient whose treatment was at issue.  258 Va. at 309-10, 519 S.E.2d at 362-63.  Thus, the only evidence regarding how the doctor treated the deceased patient's symptoms was the challenged evidence of how he routinely treated other patients with similar complaints.  Id.  Here, unlike in Ligon, the record contained properly admitted evidence to establish what the victim said about where she was going on the precise day at issue, September 1, 2002, rendering the improperly admitted evidence of her prior actions or habit merely secondary.  Thus, the risk that the improperly admitted evidence would "mislead the jury" or "divert its attention from the issues before the court" was significantly lower than in Ligon.  Id. at 311, 519 S.E.2d at 363.  Coupled with the other overwhelming, albeit

circumstantial, evidence of appellant's guilt, we hold the erroneous admission of Jackson's prior statements to Canada was harmless.

III.

For these reasons, we hold the trial court's admissions of the challenged hearsay statements and the eyewitness identifications did not constitute reversible error. We hold further that the trial court did not abuse its discretion in denying appellant's motions for mistrial. Finally, we conclude the circumstantial evidence was sufficient to support appellant's convictions. Thus, we affirm.

<u>Affirmed.</u>